[Cite as *State ex rel. Yost v. Volkswagen Aktiengesellschaft*, 2019-Ohio-5084.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, ex rel. [Dave Yost], Ohio Attorney General, | : | |
| | : | |
| Plaintiff-Appellant, | : | No. 19AP-7 (C.P.C. No. 16CV-10206) |
| | : | |
| v. | | |
| | : | (REGULAR CALENDAR) |
| Volkswagen Aktiengesellschaft d.b.a. Volkswagen Group and/or Volkswagen AG, et al., | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

D E C I S I O N

Rendered on December 10, 2019

**On brief:** *Dave Yost,* Attorney General, *Aaron S. Farmer,* and *Karia A. Ruffin*, for appellant. **Argued:** *Aaron S. Farmer.*

**On brief:** *Reminger Co., L.P.A.,* and *Hugh J. Bode*; *Sullivan & Cromwell, LLP, Robert J. Giuffra, Jr., David M.J. Rein, Matthew A. Schwartz,* and *Judson O. Littleton*, for appellees Volkswagen Aktiengesellschaft d.b.a. Volkswagen Group and/or Volkswagen AG, Audi AG, Volkswagen Group of America, Inc. d.b.a. Volkswagen of America, Inc., or Audi of America, Inc., Volkswagen of America, Inc., and Audi of America, LLC. **Argued:** *Matthew A. Schwartz.*

**On brief:** *Porter, Wright, Morris & Arthur LLP, Terrance M. Miller,* and *Elizabeth L. Moyo*; *King & Spalding LLP,* and *Joseph Eisert*, for appellees Dr. Ing. h.c. F. Porsche AG d.b.a. Porsche AG, and Porsche Cars North America, Inc.

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1}   Plaintiff-appellant, State of Ohio, ex rel. Dave Yost, Ohio Attorney General (the "State"), appeals from a judgment of the Franklin County Court of Common Pleas granting the motion to dismiss of defendants-appellees, Volkswagen Aktiengesellschaft d.b.a. Volkswagen Group and/or Volkswagen AG, Audi AG, Volkswagen Group of America, Inc., d.b.a. Volkswagen of America, Inc. or Audi of America, Inc., Volkswagen of America, Inc., Audi of America, LLC, Dr. Ing. h.c. F. Porsche AG d.b.a. Porsche AG, and Porsche Cars North America, Inc. (collectively "Volkswagen").  For the following reasons, we reverse and remand.

## I.  Factual and Procedural Background

{¶ 2}   In October 2016, the State initiated this action against Volkswagen under Ohio's Air Pollution Control Act, R.C. Chapter 3704, seeking relief for "the massive, emissions-control-tampering scheme perpetrated by [Volkswagen] in connection with their sale or lease to U.S. consumers of more than 550,000 vehicles, including approximately 14,000 in Ohio, from model year 2009 to 2016."  (Oct. 26, 2016 Compl. at 1.)

{¶ 3}   In November 2016, and pursuant to 28 U.S.C. 1446, Volkswagen removed the matter to the United States District Court for the Southern District of Ohio.  The matter was transferred to the United States District Court for the Northern District of California, which served as the multi-district litigation ("MDL") court for various actions against Volkswagen. The MDL court remanded this matter to Ohio state court based on the court's conclusion that Volkswagen had failed to demonstrate "arising under" jurisdiction pursuant to 28 U.S.C. 1331.

{¶ 4}   In August 2017, Volkswagen moved to dismiss the State's complaint pursuant to Civ.R. 12(B)(6) on the basis that the State's claims were preempted by the federal Clean Air Act., 42 U.S.C. 7401 et seq. ("CAA").  Additionally, Volkswagen moved to dismiss defendants Volkswagen AG, Audi AG, and Porsche AG for lack of personal jurisdiction.

{¶ 5}   In September 2017, the State filed an amended complaint seeking relief based on Volkswagen's emission-control-tampering scheme.  More specifically, the State alleged Volkswagen tampered with the subject vehicles, certain 2009-2016 Volkswagen, Audi, and Porsche model-year vehicles with 2.0 or 3.0 liter diesel engines, to effectively disable their emission control systems.  The State's first cause of action alleged Volkswagen tampered

with emission control systems of the subject vehicles during normal driving operation by factory installing a software-based device (known as a "defeat device") that increased the effectiveness of the emission control systems during laboratory testing but reduced the effectiveness of those systems during normal driving conditions (Count I).  The State's second cause of action alleged Volkswagen tampered with the emission control systems of the subject vehicles when it recalled and updated the software-based defeat device on vehicles already in use (Count II).  The State's third cause of action alleged Volkswagen tampered with the emission control systems of the subject vehicles when the vehicles with updated defeat devises were driven on Ohio's roads (Count III).  The State's final claim was that the named defendants engaged in a civil conspiracy to violate R.C. Chapter 3704 (Count IV).

{¶ 6}  In October 2017, Volkswagen moved to dismiss the State's amended complaint pursuant to Civ.R. 12(B)(1) and 12(B)(6) on the grounds that the CAA preempted the State's claims.  Volkswagen also again moved to dismiss the State's claims against defendants Volkswagen AG, Audi AG, and Porsche AG for lack of personal jurisdiction.

{¶ 7}  On December 7, 2018, the trial court granted Volkswagen's motion to dismiss.  As to Count I of the State's complaint, the court reasoned that this claim was based on Volkswagen's alleged misconduct before the subject vehicles were sold to end users, and therefore was expressly preempted by the CAA.  As to the State's two claims regarding Volkswagen's alleged misconduct occurring after the sale of the subject vehicles (Counts II and III), the court determined that such conduct was not expressly preempted by the CAA.  However, the court concluded that Congress intended only the federal government to regulate model-wide tampering of vehicle emission control devices, and therefore the CAA preempted the State's claims based on Volkswagen's post-sale changes to those devices on the subject vehicles.  Based on the trial court's disposition of the State's first three underlying tampering claims, it concluded that the State's civil conspiracy claim also must fail.  Because the trial court concluded that the complaint must be dismissed pursuant to Civ.R. 12(B)(6), it declined to address Volkswagen's personal jurisdiction arguments.

{¶ 8}  The State timely appeals.

## II. Assignment of Error

{¶ 9}  The State assigns the following error for our review:

> The trial court erred as a matter of law when it found that federal conflict preemption barred the State of Ohio's claims against Volkswagen (Counts Two and Three) for tampering with emissions controls on registered or licensed cars during, and after, recall and maintenance activities in Ohio.

## III.  Discussion

{¶ 10}  In the State's sole assignment of error, it alleges the trial court erred in finding that federal law preempted the State's post-sale vehicle emission control system tampering claims against Volkswagen.  We agree.

{¶ 11}  As outlined above, the State alleged Volkswagen violated Ohio law by installing software-based emission control defeat devices on the subject vehicles during manufacturing (Count I), and by tampering with the emission control systems after the sale of those vehicles (Counts II and III).  The trial court concluded that, while Counts II and III were not barred by express preemption, they were barred by conflict preemption.  Based on this disposition, the court concluded that the State's civil conspiracy claim (Count IV) also failed.  In this appeal, the State concedes the trial court properly dismissed Count I based on federal preemption, but challenges the trial court's conclusion that federal preemption also barred Counts II and III.

{¶ 12}  Whether federal law preempts state law is a question of law, and therefore we must apply a de novo standard of review without deference to the trial court's decision. *Bailey v. Manor Care of Mayfield Hts.*, 8th Dist. No. 99798, 2013-Ohio-4927, ¶ 12.  The doctrine of federal preemption arises from the Supremacy Clause of the United States Constitution, which provides that "the Laws of the United States * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Constitution, Article VI, cl. 2. Pursuant to the Supremacy Clause, the United States Congress has the power to preempt state laws.  *In re Miamisburg Train Derailment Litigation*, 68 Ohio St.3d 255, 259 (1994).

{¶ 13}  There are three ways federal law can preempt state law:  (1) where federal law expressly preempts state law (express preemption); (2) where federal law has occupied the entire field (field preemption); or (3) where there is a conflict between federal law and state

law (conflict preemption). *Norfolk S. Ry. Co. v. Bogle*, 115 Ohio St.3d 455, 2007-Ohio-5248, ¶ 7. Express preemption occurs when Congress explicitly defines the extent to which its enactments preempt state law. *English v. Gen. Elec. Co.*, 496 U.S. 72, 78 (1990). In the case of field preemption, "state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a 'scheme of federal regulation * * * so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' or where an Act of Congress 'touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " *Id.* at 79, quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). Conflict preemption occurs "where it is impossible for a private party to comply with both state and federal requirements," or "where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *English* at 79, quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Natl. Foreign Trade Council*, 530 U.S. 363, 373 (2000).

{¶ 14} In determining whether federal law preempts state law, " '[t]he purpose of Congress is the ultimate touchstone.' " *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978), quoting *Retail Clerks Internatl. Assn. v. Schermerhorn*, 375 U.S. 96, 103 (1963); *see Riverside v. State*, 190 Ohio App.3d 765, 2010-Ohio-5868, ¶ 22 (10th Dist.) ("The Supreme Court has framed preemption analysis as asking whether Congress intended to exercise its constitutionally delegated authority to set aside state laws."). "Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it. * * * Also relevant, however, is the 'structure and purpose of the statute as a whole,' * * * as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." (Internal citations omitted.) *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996).

{¶ 15} Additionally, a court reviewing possible preemption must consider federalism as part of that analysis. Federalism, which is "central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398

(2012).  "[B]ecause the States are independent sovereigns in our federal system," the United States Supreme Court has "long presumed that Congress does not cavalierly pre-empt state-law causes of action."  *Medtronic* at 485.  The "historic police powers of the states are not to be superseded by federal law unless that is the clear and manifest purpose of Congress," and therefore "a presumption exists against preemption of state police-power regulations." *Darby v. A-Best Prods. Co.*, 102 Ohio St.3d 410, 2004-Ohio-3720, ¶ 27; *PNH, Inc. v. Alfa Laval Flow, Inc.*, 130 Ohio St.3d 278, 2011-Ohio-4398, ¶ 18, *Wyeth v. Levine*, 555 U.S. 555, 565 (2009); *Rice* at 230.  A traditional exercise of the states' "police powers [is] to protect the health and safety of their citizens."  *Medtronic* at 475; *see Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 442 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power.").  In view of these principles, there is a "high threshold [that] must be met if a state law is to be pre-empted for conflicting with the purposes of a federal Act."  (Internal quotation marks omitted.)  *Chamber of Commerce of United States of Am., v. Whiting*, 563 U.S. 582, 607 (2011) (plurality opinion).

{¶ 16}  The dispute in this case centers on whether the State's post-sale motor vehicle emission control system tampering claims against Volkswagen were conflict preempted. There is no suggestion that it was impossible for Volkswagen to comply with both state and federal requirements; thus, our focus concerns whether Ohio law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Ultimately, the issue is whether Congress demonstrated a clear and manifest intent that there is exclusive federal regulatory jurisdiction over manufacturer conduct relating to model-wide emission control system tampering of in-use motor vehicles.

{¶ 17}  The CAA establishes a framework for the nationwide protection of air quality standards.  While Title I of the CAA addresses fixed sources of pollution, such as factories and power plants, 42 U.S.C. 7401-7431, Title II of the CAA addresses mobile sources of air pollution, including motor vehicles.  42 U.S.C. 7521-7590.  In declaring the purpose of the CAA, Congress expressly stated that "[a] primary goal of the [CAA] is to encourage or otherwise promote reasonable Federal, State, and local governmental actions, consistent with the provisions of this [CAA], for pollution prevention."  42 U.S.C. 7401(c).  Regarding motor vehicle emission control systems, the CAA prohibits any "person" from removing or rendering "inoperative any device or element of design installed on or in a motor vehicle or

motor vehicle engine in compliance with regulations under this title prior to its sale and delivery to the ultimate purchaser, or for any person knowingly to remove or render inoperative any such device or element of design after such sale and delivery to the ultimate purchaser." 42 U.S.C. 7522(a)(3)(A). The civil penalty for violating this anti-tampering provision is up to $25,000 per violation for a manufacturer or dealer, and $2,500 per violation for any person other than a manufacturer or dealer. 42 U.S.C. 7524(a). The Administrator of the federal Environmental Protection Agency ("EPA") may commence in an appropriate federal district court a civil action to assess and recover any civil penalty available under 42 U.S.C. 7522(a)(3)(A). 42 U.S.C. 7524(b). Or, in certain circumstances, the federal EPA Administrator may assess any civil penalty prescribed in 42 U.S.C. 7524(a). 42 U.S.C. 7524(c)(1).

{¶ 18} The CAA contains an express preemption provision. 42 U.S.C. 7543(a) states as follows:

> No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

Thus, the CAA expressly precludes the states from enforcing "any standard relating to the control of emissions from" any "new motor vehicle," which means "a motor vehicle the equitable or legal title to which has never been transferred to an ultimate purchaser." 42 U.S.C.S. 7550(3). While not expressly stated, this provision effectively nationalizes the standards for emission control devices in new motor vehicles, thereby preventing the existence of a patchwork of standards for manufacturers to comply with as to vehicles they design and manufacture. In view of this provision, the states are precluded from regulating manufacturer conduct relating the manufacturing of emission controls systems in new motor vehicles. However, this statute's savings clause, subsection (d), provides that "[n]othing in this part [42 USCS §§ 7521 et seq.] shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles." 42 U.S.C. 7543(d).

{¶ 19} The CAA's express preemption provision does not address the regulation of emissions of in-use motor vehicles. "[A]n express definition of the pre-emptive reach of a statute * * * supports a reasonable inference * * * that Congress did not intend to pre-empt other matters." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995). Thus, based on this provision, it may be inferred that Congress did not intend to preempt state law prohibiting manufacturers from tampering with in-use motor vehicle emission control systems. However, while the CAA's express preemption provision may support this reasonable inference, it "does not mean that the express clause entirely forecloses any possibility of implied pre-emption." *Id.*

{¶ 20} The CAA also directs the federal EPA Administrator to "prescribe (and from time to time revise) in accordance with the provisions of this section, standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. 7521(a)(1). These standards are "applicable to such vehicles and engines for their useful life." 42 U.S.C. 7521(a)(1). In view of the CAA, "[t]he sovereign prerogatives to force reductions in greenhouse gas emissions * * * and (in some circumstances) to exercise the police power to reduce motor-vehicle emissions are now lodged in the Federal Government." *Massachusetts v. E.P.A.*, 549 U.S. 497, 498 (2007).

{¶ 21} Like the CAA, Ohio's Air Pollution Control Act ("APCA"), R.C. Chapter 3704, governs air pollution control. The stated purposes of the APCA are "to protect and enhance the quality of the state's air resources" and "[t]o enable the state, through the director of environmental protection, to adopt and maintain a program for the prevention, control, and abatement of air pollution that is consistent with the federal Clean Air Act." R.C. 3704.02(A)(1) and (2). The APCA prohibits certain acts to further its purposes. Here, the State alleged Volkswagen violated R.C. 3704.16(C)(3), which provides that "[n]o person shall knowingly * * * [t]amper with any emission control system installed on or in a motor vehicle after sale, lease, or rental and delivery of the vehicle to the ultimate purchaser, lessee, or renter." *See also* Ohio Adm.Code 3745-80-02(F) ("No person shall knowingly tamper with any emission control system installed on or in a motor vehicle after sale, lease, or rental and delivery of the motor vehicle to the ultimate purchaser, lessee or renter."). "Tamper with" means "to remove permanently, bypass, defeat, or render inoperative, in

whole or part, any emission control system that is installed on or in a motor vehicle." R.C. 3704.16(A)(1). Pursuant to R.C. 3704.06(C), a "person who violates * * * 3704.16 of the Revised Code shall pay a civil penalty of not more than twenty-five thousand dollars for each day of each violation."

{¶ 22} Volkswagen generally argues that the CAA contemplates comprehensive federal regulation of manufacturers' conduct relating to emission control systems on new and in-use motor vehicles, and limits state and local authority over emission control systems tampering to those involving individual motor vehicles. Volkswagen contends that duplicative enforcement by every state regarding nationwide post-sale tampering would undermine congressional intent as it relates to the assessment of penalties for CAA violations, and that an unduly burdensome patchwork of regulatory schemes impacting manufacturers' conduct relating to emission control systems of in-use motor vehicles also would be contrary to congressional intent. We are unpersuaded.

{¶ 23} As set forth above, congressional intent that federal law supersede state law as to standards relating to new motor vehicle emission control systems is clearly expressed in 42 U.S.C. 7543(a). This preemption relates to the manufacturing of vehicles before they are sold and placed on the roads. And this intent is consistent with the idea that a patchwork of regulatory programs across the country would be unduly burdensome on vehicle manufacturers, as it relates to the engineering and production of those vehicles. But this concept is not entirely applicable as it relates to the tampering of emission control systems in vehicles that have been sold to end users. Given this substantive difference, we find that congressional intent that the federal government solely regulate emission control systems in new motor vehicles, as a means to mitigate obstructions to interstate commerce, does not also demonstrate an intent that the federal government solely regulate any tampering with those devices in motor vehicles already placed in the stream of commerce.

{¶ 24} Further, by suing Volkswagen for post-sale motor vehicle emission control system tampering, the State is exercising its traditional police power to protect air quality within its jurisdiction. To preclude such action, congressional intent to preempt must be clear and manifest. The CAA's Title II savings clause reflects congressional intent that the states maintain significant authority in regulating conduct affecting motor vehicle emissions. And the preemption of state action designed to curtail and discourage the type of in-use motor vehicle emission control system tampering alleged here would be contrary

to Congress' stated purpose for the CAA.  A clear purpose of the CAA is to reduce air pollution, and the savings clause reflects an intent that the states maintain authority in that endeavor.

{¶ 25}  The trial court found that the use of the word "otherwise" in the savings clause indicates that state and local regulation of in-use motor vehicles is limited by the division of authority between the federal EPA and the states and local governments.  We disagree. This statute provides that "nothing" in 42 U.S.C. 7521 et seq. "shall preclude or deny to any State or political subdivision thereof the right *otherwise* to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles."  (Emphasis added.) 42 U.S.C. 7543(d).  But Congress' use of the word "otherwise" does not further define that division so as to preclude overlap in the authority to regulate manufacturer (but not non-manufacturer) tampering of the emission control systems of in-use motor vehicles.  Thus, while the CAA places exclusive authority to regulate new motor vehicle emission control systems with the federal government, the CAA does not draw such a clear division of exclusive authority as it relates to emission control systems of in-use motor vehicles.

{¶ 26} We also disagree with Volkswagen's contention that imposition of State penalties would disrupt the calibration of force reflected in the federal penalties.  According to Volkswagen, the prospect of massive penalties under Ohio law against Volkswagen could be far more than the amount paid to the federal EPA, and that this circumstance demonstrates an undermining of the congressional calibration of force as to emission control system tampering by vehicle manufacturers.  Relatedly, Volkswagen asserts that the factors that must be considered in assessing federal penalties demonstrates congressional intent that the federal penalties constitute the exclusive penalties for vehicle emission systems tampering conduct.

{¶ 27}  A manufacturer can be penalized up to $25,000 per violation of 42 U.S.C. 7522(a)(3)(A).  42 U.S.C. 7524(a).  In an administrative assessment of penalties, 42 U.S.C. 7524(c)(2) directs the federal EPA Administrator to consider "the gravity of the violation, the economic benefit or savings (if any) resulting from the violation, the size of the violator's business, the violator's history of compliance with this title, action taken to remedy the violation, the effect of the penalty on the violator's ability to continue in business, and such other matters as justice may require."  *See* 42 U.S.C. 7524(b) (directing a federal district court to consider the same factors in determining the amount of any civil penalty).  Thus,

in fashioning the appropriate penalty for violation of federal law, 42 U.S.C. 7524 directs either the Administrator of the EPA or the court to consider various circumstances, including "such other matters as justice may require." This framework does not preclude the consideration of possible additional state action against a violator.

{¶ 28} Furthermore, state law is not preempted simply because it imposes a penalty for prohibited conduct that is also prohibited and penalized under federal law. *See Westfall v. United States*, 274 U.S. 256, 258 (1927) (states may enact laws imposing penalties for conduct that federal law also prohibits); *see also Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984) (supporting same general principle). Here, the State seeks to impose penalties for violation of Ohio law, not federal law. The application of state law to supplement the total potential financial penalty faced by a manufacturer aligns with the purpose of reducing air pollution because it acts as an additional deterrent to misconduct.

{¶ 29} Based on our review of the CAA, we find no clear and manifest congressional purpose to preempt the State's in-use motor vehicle emission control system tampering claims. In reaching this conclusion, we are mindful of other courts reaching a contrary conclusion. In particular, Volkswagen relies heavily on the federal MDL court's conclusion that Congress intended for only the federal EPA to regulate post-sale motor vehicle emission control system tampering. *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Prods. Liability Litigation*, 310 F.Supp.3d 1030 (N.D.Cal.2018) ("*Counties*"). Volkswagen also relies on appellate court decisions in Tennessee, Alabama, and Minnesota, wherein the courts, citing the *Counties* decision with approval, concluded that the CAA preempted post-sale motor vehicle emission control system tampering regulation by the states. *State ex rel. Slatery v. Volkswagen Aktiengesellschaft*, App. No. M2018-00791-COA-R9-CV, 2019 Tenn. App. LEXIS 125 (Mar. 13, 2019); *State v. Volkswagen AG*, No. 1170528, 2018 Ala. LEXIS 133 (Dec. 14, 2018); *State v. Volkswagen Aktiengesellschaft*, App. No. A18-0544, 2018 Minn. App. Unpub. LEXIS 995 (Dec. 3, 2018).

{¶ 30} Ohio courts are not bound by decisions of courts in other states, or even "rulings on federal statutory or constitutional law made by a federal court other than the United States Supreme Court," but we are free to consider the persuasiveness of such decisions. *State v. Burnett*, 93 Ohio St.3d 419, 424 (2001); *State v. Roberts*, 137 Ohio St.3d 230, 2013-Ohio-4580, ¶ 33; *State v. Chinn*, 2d Dist. No. 16764, 1998 Ohio App. LEXIS 3857 (Aug. 21, 1998). Here, we are unpersuaded by the reasoning of the MDL court, and the

Tennessee, Alabama, and Minnesota state appellate courts that largely followed that reasoning.

{¶ 31} The *Counties* court acknowledged the dual authority of the federal government and the states to prohibit in-use motor vehicle emission control systems tampering by individuals, but then discerned a differentiation between conduct of individuals and manufacturers to support its conclusion that only the federal government may take action against model-wide in-use motor vehicle emission control system tampering by a manufacturer. The *Counties* court reasoned that this distinction aligns with the division of authority in the enforcement of emission standards between the federal EPA and the states and the practical advantages the federal EPA has over the states in regulating model-wide emission issues that have a nationwide scope. *Counties* at 1043. We agree that it is clear that Congress intended the federal EPA to regulate model-wide emission control system tampering. And while we also agree there is a difference in scale between an individual that tampers with one motor vehicle and a manufacturer that tampers with thousands of vehicles on a nationwide scale, that difference does not, in and of itself, mean that there exists clear and manifest congressional intent to preempt state law regarding post-sale tampering conduct of manufacturers (but not non-manufacturers). Likewise, we are unconvinced that the CAA's provision authorizing the EPA to regulate motor vehicle emissions standards extending through their useful life, 42 U.S.C. 7521(a)(1), demonstrates congressional intent that States are precluded from independently sanctioning widespread cases of tampering with in-use motor vehicle emission control systems occurring within their respective jurisdictions.

{¶ 32} In support of its finding that Congress intended manufacturer tampering of emission control systems of in-use motor vehicles only to be regulated by the federal government, the *Counties* court emphasized the difficulties potentially faced by manufacturers in being subject to many different regulatory schemes relating to such conduct. While lessoning manufacturer burdens relating to updates or other changes to vehicles that are already in the stream of commerce may constitute a legitimate congressional concern, such a concern is reasonably diminished when that conduct involves tampering with the existing emission control systems to reduce their effectiveness. Conversely, preserving traditional state police power to protect the health of its residents, as it relates to the tampering of existing in-use motor vehicle emission control systems,

aligns with the expressed purpose of the CAA. As determined above, the CAA lacks clear and manifest congressional intent to supersede that state police power.

{¶ 33} Lastly, we note that, as an alternative argument in support of the trial court's judgment, Volkswagen argues the State's claims based on post-sale misconduct were expressly preempted by 42 U.S.C. 7543(a), which prohibits any "State or any political subdivision thereof [from] adopt[ing] or attempt[ing] to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." Volkswagen reasons that the post-sale software tampering related back to the original design of the motor vehicles by Volkswagen and therefore effectively related to the design of a new motor vehicle. The trial court rejected this argument. We agree with the trial court on this issue because the State's regulation of post-sale software tampering does not constitute an attempt to impose emission standards relating to the original design of the motor vehicles and their emission control systems.

{¶ 34} Because the trial court erred in granting Volkswagen's motion to dismiss, we sustain the State's sole assignment of error.

## IV. Disposition

{¶ 35} Having sustained the State's sole assignment of error, we reverse the judgment of the Franklin County Court of Common Pleas and remand this matter to that court for further proceedings consistent with law and this decision.

*Judgment reversed;*
*cause remanded.*

BROWN and BRUNNER, JJ., concur.