**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE VOLKSWAGEN "CLEAN DIESEL" MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION, | No. 18-15937<br><br>D.C. No. 3:15-md-02672-CRB |
| THE ENVIRONMENTAL PROTECTION COMMISSION OF HILLSBOROUGH COUNTY, Florida; SALT LAKE COUNTY, *Plaintiffs-Appellants*, | OPINION |
| v. | |
| VOLKSWAGEN GROUP OF AMERICA, INC.; AUDI OF AMERICA, LLC; PORSCHE CARS NORTH AMERICA, INC.; ROBERT BOSCH, LLC; ROBERT BOSCH GMBH, *Defendants-Appellees.* | |

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted August 6, 2019
Anchorage, Alaska

Filed June 1, 2020

Before:  Richard C. Tallman, Sandra S. Ikuta,
and N. Randy Smith, Circuit Judges.

Opinion by Judge Ikuta

## SUMMARY[*]

### Clean Air Act / Preemption

The panel affirmed in part, and reversed in part, the district court's dismissal of complaints brought by two counties against Volkswagen after it installed defeat devices in new cars, and subsequently modified those devices post sale, for the purpose of evading compliance with federally mandated emission standards.

Volkswagen settled the Environmental Protection Agency (" EPA")'s criminal and civil actions for over $20 billion, but failed to obtain a release of liability from state and local governments.  In this action, two counties sought to impose penalties for violation of their laws prohibiting tampering with emission control systems.  The district court held that the counties' actions were preempted by the Clean Air Act.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel agreed with the district court that the Clean Air Act expressly preempted state and local government efforts to apply anti-tampering laws to *pre*-sale vehicles. The panel disagreed with the district court's ruling that the Clean Air Act impliedly preempted state authority to enforce anti-tampering laws against *post*-sale vehicles. The panel held that the Clean Air Act did not prevent the two counties here from enforcing their regulations against Volkswagen for post-sale vehicles.

The panel rejected Volkswagen's assertions that the counties' anti-tampering rules were preempted under ordinary preemption principles. First, Volkswagen argued that Congress intended to give the EPA exclusive oversight over post-sale compliance with emission standards on a model-wide basis, and the counties' anti-tampering rules posed an obstacle to this goal. The panel saw no indication that Congress intended to preempt state and local authority to enforce anti-tampering rules on a model-wide basis. Second, Volkswagen argued that the Clean Air Act's penalty provision, 42 U.S.C. § 7524, showed that Congress struck a balance of interests with respect to the imposition of penalties, and this balance would be disturbed if states could impose their own penalties for tampering with post-sale vehicles. The panel held that the Clean Air Act's cooperative federalism scheme, its express preservation of state and local police powers post sale, and the complete absence of a congressional intent to vest in the EPA the exclusive authority to regulate every incident of post-sale tampering raised the strong inference that Congress did not intend to deprive the EPA of effective aid from local officers to combat tampering with emission control systems.

## COUNSEL

Peter K. Stris (argued), Stris & Maher LLP, Los Angeles, California, for Plaintiffs-Appellants.

W. Daniel "Dee" Miles III, H. Clay Barnett, and Archie I. Grubb II, Beasley Allen Crow Methvin Portis & Miles P.C., Montgomery, Alabama; Luis Martinez-Monfort, Gardner Brewer Martinez-Monfort P.A., Tampa, Florida; Thomas L. Young, Law Office of Thomas L. Young P.A., Tampa, Florida; for Plaintiff-Appellant Environmental Protection Commission of Hillsborough County.

Bridget K. Romano, Deputy District Attorney, Office of the Salt Lake County District Attorney, Salt Lake City, Utah; Colin P. King and Paul M. Simmons, Dewsnup King Olsen Worel Havas Mortensen, Salt Lake City, Utah; for Plaintiff-Appellant Salt Lake County.

Robert J. Giuffra, Jr. (argued), Sharon L. Nelles, David M.J. Rein, and Matthew A. Schwartz, Sullivan & Cromwell LLP, New York, New York; for for Defendants-Appellees Volkswagen Group of America, Inc. and Audi of America, LLC.

Cari K. Dawson, Alston & Bird LLP, Atlanta, Georgia, for Defendant-Appellee Porsche Cars North America, Inc.

Carmine D. Boccuzzi, Jr., Cleary Gottlieb Steen & Hamilton LLP, New York, New York; Matthew D. Slater, Cleary Gottlieb Steen & Hamilton LLP, Washington, D.C.; for Defendant-Appellee Robert Bosch, LLC and Robert Bosch GMBH.

Richard W. Mithoff, Sherie Potts Beckham, and Warner V. Hocker, Mithoff Law, Houston, Texas; Russell S. Post and Owen J. McGovern, Beck Redden LLP, Houston, Texas; Benny Agosto, Jr. and Muhammad S. Aziz, Abraham Watkins Nichols Sorrels Agosto & Friend, Houston, Texas; Debra Tsuchiyama Baker, Earnest W. Wotring, John Muir, and David George, Baker & Botring LLP, Houston, Texas; Vince Ryan, Robert Soard, Terence L. O'Rourke, and Rock W.A. Owens, Office of the Harris County Attorney, Houston, Texas; for Amicus Curiae Harris County, Texas.

Jonathan S. Martel, Arnold & Porter Kaye Scholer LLP, Washington, D.C.; S. Zachary Fayne, Arnold & Porter Kaye Scholer LLP, San Francisco, California; Sarah Grey, Arnold & Porter Kaye Scholer LLP, Denver, Colorado; Steven P. Lehotsky and Michael B. Schon, U.S. Chamber Litigation Center, Washington, D.C.; for Amici Curiae Alliance of Automobile Manufacturers Inc., Association of Global Automakers, and Chamber of Commerce of the United States of America.

**OPINION**

IKUTA, Circuit Judge:

Volkswagen,[1] a car manufacturer, installed defeat devices in new cars for the purpose of evading compliance with federally mandated emission standards, and subsequently updated the software in those cars so the defeat devices would do a better job of avoiding and preventing compliance.[2] Volkswagen settled EPA's criminal and civil actions for over $20 billion dollars—but failed to obtain a release of liability from state and local governments at the same time. When two counties sought to impose additional penalties for violation of their laws prohibiting tampering with emission control systems, Volkswagen persuaded the district court that these claims were preempted by the Clean Air Act.

We agree with the district court only in part. We agree that the Clean Air Act expressly preempts state and local government efforts to apply anti-tampering laws to *pre-sale* vehicles.[3] But we disagree with the district court's ruling that

---

[1] We use "Volkswagen" to refer to the parent company, Volkswagen Aktiengesellschaft ("Volkswagen AG") and its several subsidiaries, including Volkswagen Group of America, Inc. ("Volkswagen USA"), Audi of America, LLC ("Audi"), and Porsche Cars North America, Inc. ("Porsche").

[2] The following background facts are taken from the "Statement of Facts," to which Volkswagen stipulated pursuant to its plea agreement with the federal government. *See United States v. Volkswagen AG*, No. 16-cr-20394-SFC-APP-8, Dkt. 68 (E.D. Mich. Mar. 10, 2017).

[3] We likewise agree with the district court that the Clean Air Act does not expressly preempt the application of state and local anti-tampering laws to post-sale vehicles.

the Clean Air Act impliedly preempts state authority to enforce anti-tampering laws against *post-sale* vehicles. In other words, the Clean Air Act does not prevent the two counties here from enforcing their regulations against Volkswagen for tampering with post-sale vehicles.

We base this conclusion on Supreme Court precedent. A "high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (citation omitted). Volkswagen has not met that high threshold here. The text and structure of the Clean Air Act do not indicate any congressional intent to prohibit states from enforcing anti-tampering laws in this context. Moreover, the regulation of air pollution for health and welfare purposes "falls within the exercise of even the most traditional concept of what is compendiously known as the police power," *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 442 (1960), so we must "assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress,'" *Arizona v. United States*, 567 U.S. 387, 400 (2012) (citation omitted). No such purpose exists here.

We acknowledge that our conclusion—that the Clean Air Act does not prevent the two counties from enforcing their regulations against Volkswagen for tampering with post-sale vehicles—may result in the imposition of unexpected (and enormous) liability on Volkswagen. But that result is caused by the unusual and perhaps unprecedented situation before us. In drafting the Clean Air Act, Congress apparently did not contemplate that a manufacturer would intentionally tamper with the emission control systems of its vehicles after sale in order to improve the functioning of a device intended to

deceive the regulators.  In other words, Volkswagen faces liability due to the straightforward application of the Clean Air Act and the preemption doctrine to its unexpected and aberrant conduct.  We may not strain to give Volkswagen the equivalent of a release from state and local liability (which it did not secure for itself) by engaging in a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law."  *Whiting*, 563 U.S. at 607 (internal quotation marks and citation omitted).[4]

I

Under Title II, Part A of the Clean Air Act of 1990 (CAA),[5] car manufacturers cannot sell new motor vehicles in the United States unless the vehicles comply with federal

---

[4] In view of the federal government's central role in bringing comprehensive civil and criminal enforcement actions against Volkswagen and ultimately obtaining a $20 billion settlement, and given that "the agency's own views should make a difference" on the question of federal preemption, *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 335 (2011) (citation omitted), we asked the Solicitor General of the United States and the EPA for their views on whether the CAA preempts a state or its political subdivision from enforcing state or local anti-tampering laws with respect to post-sale vehicles and whether their agreements to settle their federal claims against Volkswagen were intended to foreclose subsequent state or local civil financial penalties. *Envtl. Prot. Comm'n of Hillsborough Cty. v. Volkswagen Grp. of Am., Inc.*, No. 18-15937, Dkt. 64 (9th Cir. Aug. 22, 2019).  The federal government elected not to provide its opinion on these issues to aid us in addressing these significant questions.  *Id.*, Dkt. 70 (Nov. 4, 2019).

[5] Title II of the CAA governs "Emission Standards for Moving Sources."  42 U.S.C. §§ 7521–7590.  Part A of this title governs "Motor Vehicle Emission and Fuel Standards."  §§ 7521–7554.

emission standards, including standards for the emission of nitrogen oxide (NOx). *See* 42 U.S.C. §§ 7521, 7525. The CAA gives the Environmental Protection Agency (EPA) the authority to establish emission standards for new motor vehicles, § 7521(a)(1), and administer a certification program to ensure compliance with those standards, § 7525. To obtain a certificate of conformity from the EPA, a manufacturer must submit an application to the EPA; the application must be submitted for each model year and it must include (among other things) test results from standardized federal emission tests that demonstrate compliance with the applicable emission standards. *See* 40 C.F.R. §§ 86.1843-01, 86.1844-01, 86.1848-01. The CAA also governs the use of emission control devices. 42 U.S.C. § 7521(a)(4)(A). A device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use" is called a "defeat device," 40 C.F.R. § 86.1803-01,[6] and is prohibited, *see* 42 U.S.C. § 7522(a)(3)(B).

A

In 1998, the EPA established new federal emission standards for light duty vehicles, the type of vehicles at issue

---

[6] 40 C.F.R. § 86.1803-01 provides:

Defeat device means an auxiliary emission control device (AECD) that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use, unless: [listing exceptions].

here,[7] including stricter NOx emission standards. Manufacturers were required to comply with the new standards beginning with model year 2007 vehicles. Volkswagen concluded that some of its diesel engine vehicles would not be able to meet the heightened NOx emission standards while still operating at a performance level that could attract customers. Therefore, beginning in 2006, Volkswagen employees developed and installed two defeat devices that would enable its diesel engine vehicles to pass federal emission tests, even though the vehicles could not actually meet the NOx emission standards while being driven on the street.

Volkswagen installed different defeat devices in vehicles with a 2.0 liter diesel engine (the "2.0 Liter Vehicles") and vehicles with a 3.0 liter diesel engine (the "3.0 Liter Vehicles"). The defeat device in the 2.0 Liter Vehicles comprised software designed to recognize whether the vehicle was undergoing federal emission testing on a dynamometer[8] or was being driven on the road. When the software detected that the vehicle was being tested, the vehicle performed in "dyno mode," i.e., in compliance with federal NOx emission standards. Otherwise, the vehicle would operate in "street mode," which substantially reduced the effectiveness of the vehicle's emission control system.

---

[7] "Light-duty vehicle means a passenger car or passenger car derivative capable of seating 12 passengers or less." 40 C.F.R. § 86.082-2.

[8] A "dynamometer" is an instrument that measures the power output of an engine. *Dynamometer*, Webster's Third New International Dictionary 711 (2002) ("an apparatus for measuring mechanical power (as of an engine, an electric motor, or a draft animal)").

When in street mode, the vehicle's NOx emissions were up to 35 times higher than federal standards.

The defeat device installed in the 3.0 Liter Vehicles was also designed to recognize when the vehicle was undergoing emission testing, but rather than cause the vehicle to switch between dyno mode and street mode, the defeat device injected varying amounts of a solution, AdBlue, into the exhaust system. When the vehicle was being tested, the defeat device would inject high amounts of AdBlue, reducing NOx emissions below federal standards. When the vehicle was being driven on the street, the defeat device would inject less AdBlue, causing NOx emissions to exceed federal standards.

Between 2009 and 2015, Volkswagen installed these defeat devices in approximately 585,000 new motor vehicles that were sold in the United States. During this period, Volkswagen deliberately misled the EPA by concealing the defeat devices and certifying that the vehicles complied with federal NOx emission standards. Unaware of Volkswagen's deception, the EPA issued certificates of conformity for these vehicles in each model year. Volkswagen also misled consumers by marketing the vehicles as "clean diesel" and "environmentally-friendly," despite knowing that the vehicles "were intentionally designed to detect, evade and defeat U.S. emissions standards."

Around 2012, consumers who purchased a 2.0 Liter Vehicle began reporting hardware failures. In investigating these failures, Volkswagen engineers theorized that the defeat device failed to switch into street mode when the vehicle was being driven on the street. Because the 2.0 Liter Vehicles were not designed to comply with NOx emission standards

except during the short periods of testing, the Volkswagen engineers suspected that the hardware failures were caused by the increased stress on the exhaust system from being driven too long in compliance with NOx standards, i.e., in dyno mode.

To prevent such hardware failures, Volkswagen developed two software updates for the 2.0 Liter Vehicles. The first software update would decrease stress on the exhaust system by causing the vehicle to start in street mode rather than dyno mode; the second update would improve emission-testing detection by adding a "steering wheel angle recognition" feature. If a vehicle's steering wheel was stationary, the updated software would recognize that the vehicle was being tested and the engine would switch to dyno mode. But if the updated software detected that the steering wheel was turning, it would allow the engine to operate in street mode.

Volkswagen began installing the updated software in new 2.0 Liter Vehicles in 2014. The same year, Volkswagen took the following steps for its post-sale 2.0 Liter Vehicles. First, it issued voluntary recalls and installed the software fixes without revealing their purpose. Second, it updated the software when customers brought their cars in for normal maintenance, again without revealing the purpose of the software updates. In each scenario, Volkswagen deceptively told EPA regulators and American consumers that the software updates were intended to improve the operation of the 2.0 Liter Vehicles.

An independent study soon revealed that certain Volkswagen vehicles emitted air pollutants at concentrations "of up to approximately 40 times the permissible limit." The

EPA commenced an investigation. In August 2015, a Volkswagen whistleblower informed federal regulators about the defeat device in the 2.0 Liter Vehicles. Eventually, Volkswagen disclosed the entire scheme affecting both the 2.0 and 3.0 Liter Vehicles to federal regulators.

The EPA subsequently issued notices of violation and filed civil and criminal actions against Volkswagen for violating the CAA. In the civil action, the EPA charged Volkswagen with installing a defeat device on new motor vehicles, in violation of 42 U.S.C. § 7522(a)(3)(B), and tampering with emission control systems, in violation of § 7522(a)(3)(A), among other things. In the criminal action, the EPA charged Volkswagen with conspiracy, 18 U.S.C. § 371, obstruction of justice, § 1512(c), and introducing imported merchandise into the United States by means of false statements, § 542.

Volkswagen pleaded guilty to the criminal charges and agreed to pay a $2.8 billion fine to the United States. Pursuant to the plea agreement, Volkswagen stipulated to a detailed statement of facts regarding the defeat devices and agreed not to "contest the admissibility of, nor contradict" those stipulated facts "in any proceeding." The plea agreement did not give Volkswagen "any protection against prosecution" from state or local governments.

Volkswagen also settled the civil CAA claims, entering into three consent decrees with the United States.[9] Other than

---

[9] California was a party to both the first and second consent decrees. At the time, California was authorized to "adopt and enforce" its own "standards relating to control of emissions from new motor vehicles." 42 U.S.C. § 7507; *see also* § 7543(b). *But see* The Safer Affordable Fuel-

California (which entered into the first and second consent decrees), no other state or local government released Volkswagen from liability. To the contrary, each state expressly reserved its ability to sue Volkswagen for damages.[10] In total, Volkswagen's liability exceeded $20 billion.

B

While the EPA was litigating its civil and criminal actions against Volkswagen, a number of states and counties brought separate lawsuits against the company for violating state and local laws that prohibit tampering with vehicle emission control systems.

In 2016, the Multidistrict Litigation (MDL) judicial panel transferred these actions to the district court for the Northern

---

Efficient (SAFE) Vehicles Rule Part One: One National Program, 84 Fed. Reg. 51310 (Sept. 27, 2019) (withdrawing the waiver previously provided to California for certain emission standards, as applied to new motor vehicles). Under this grant of authority, California, like the United States, brought claims for injunctive relief against Volkswagen, alleging violations of California environmental and unfair competition laws.

[10] Specifically, each state expressly reserved its right "to seek fines or penalties" against Volkswagen in connection with being named a beneficiary of a trust created by Volkswagen to help reduce the NOx emissions caused by Volkswagen's noncompliant vehicles. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 3:15-md-02672, Dkt. 2103-1, App'x D-3 at 2 (N.D. Cal. Apr. 16, 2018).

District of California.[11] In 2017, the district court granted Volkswagen's motion to dismiss a suit brought by Wyoming, holding that the state's claim that Volkswagen violated Wyoming law by installing the defeat device in new motor vehicles was preempted by the CAA. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 264 F. Supp. 3d 1040, 1052–57 (N.D. Cal. 2017). In light of the district court's ruling, several local governments amended their respective complaints to allege facts relating not only to Volkswagen's installation of the defeat device in new motor vehicles (i.e., pre-sale conduct), but also to Volkswagen's modification to the defeat device in used vehicles (i.e., post-sale conduct).

Two of these complaints, one from Salt Lake County, Utah, and one from Hillsborough County, Florida, (collectively, the "Counties") are before us on appeal.

Salt Lake County sued Volkswagen in Utah state court. In its third amended complaint, Salt Lake County alleged that Volkswagen's installation of and modification to the defeat devices violated Utah's anti-tampering regulation, which

---

[11] On December 8, 2015, pursuant to 28 U.S.C. § 1407, the MDL judicial panel transferred 63 actions relating to Volkswagen's defeat device as MDL No. 2672 to the Northern District of California for coordinated pretrial proceedings. The MDL judicial panel noted that any other related actions were potential tag-along actions. *See* Rule 1.1(h), Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation ("'Tag-along action' refers to a civil action pending in a district court which involves common questions of fact with either (1) actions on a pending motion to transfer to create an MDL or (2) actions previously transferred to an existing MDL, and which the Panel would consider transferring under Section 1407."). To date, the MDL judicial panel has transferred over 1,500 actions as tag-along actions.

provides: "[n]o person shall remove or make inoperable the [emission control] system or device or any part thereof, except for the purpose of installing another [emission control] system or device, or part thereof, which is equally or more effective in reducing emissions from the vehicle to the atmosphere." Utah Admin. Code R. 307-201-4.[12] The complaint alleged that Volkswagen violated this regulation by installing defeat devices in new vehicles to render the emission control systems inoperable, and by modifying the software in post-sale vehicles to enhance the defeat devices' capabilities. The penalty for violating Utah's anti-tampering regulation is up to $5,000 per violation, with each day of violation constituting a separate offense. Utah Code Ann. § 19-1-303(1)(a), (3). The complaint also brought common law claims for intentional misrepresentation and nuisance. Volkswagen removed the Salt Lake County action to federal court.

The Environmental Protection Commission of Hillsborough County (EPC), Florida, filed an action against Volkswagen in Florida district court. EPC's first amended complaint alleged that Volkswagen violated two of the county's anti-tampering and defeat device regulations, which provide that "[n]o person shall tamper, cause, or allow the tampering of the emission control system of any motor vehicle," and no person shall "manufacture, install, sell or advertise for sale, devices to defeat or render inoperable any component of a motor vehicle's emission control system."

---

[12] *See also* Utah Code Ann. § 26A-1-123(1)(a) ("It is unlawful for any person, association, or corporation, and the officers of the association or corporation to violate state laws or any lawful notice, order, standard, rule, or regulation issued under state laws or local ordinances regarding public health or sanitation.").

Rules of Envtl. Prot. Comm'n of Hillsborough Cty., Rule 1-8.05(1), (6).[13] The complaint alleged that Volkswagen violated these provisions by installing defeat devices in new vehicles, and by tampering with the emission control systems of used vehicles registered in the county through a program of field fixes and recall campaigns. The penalty for violating Hillsborough County's anti-tampering and defeat device regulation is up to $5,000 per violation, with each day of violation constituting a separate offense. *See* Hillsborough County Environmental Protection Act, Fla. Laws 84-446 § 17(2) (as amended by Fla. Laws 87-495 (2005)).

The Counties' claims were transferred to the district court presiding over the MDL as tag-along actions. Volkswagen moved to dismiss the Counties' claims for failure to state a claim. The district court granted the motion. It first determined that, on their face, the Counties' anti-tampering rules applied to Volkswagen's conduct in installing and subsequently enhancing the defeat devices. Volkswagen does not challenge this conclusion.

Nevertheless, the district court dismissed the Counties' actions with prejudice. It held that the Counties' claims, as applied to new vehicles, were preempted by § 209 of the CAA, which precludes state and local governments from adopting or attempting to enforce "any standard relating to

---

[13] As used in the Hillsborough County regulations, "emission control system" means "the devices and mechanisms installed as original equipment at the time of manufacture . . . for the purpose of reducing or aiding in the control of emissions," Rules of Envtl. Prot. Comm'n of Hillsborough Cty., Rule 1-8.03(2)(b), and "tampering" means "the intentional inactivation, disconnection, removal or other modification of a component or components of the emission control system resulting in it being inoperable," *id.*, Rule 1-8.03(2)(h).

the control of emissions from new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a). As to post-sale vehicles, the district court concluded that the CAA preempts the Counties' anti-tampering rules because Volkswagen made post-sale software changes on a model-wide basis and Congress intended for model-wide tampering to be regulated exclusively by the EPA.

On appeal, the Counties argue that the CAA does not preempt their claims for either pre-sale or post-sale vehicles.

We have jurisdiction under 28 U.S.C. § 1291. We review the district court's preemption analysis de novo. *Ting v. AT&T*, 319 F.3d 1126, 1135 (9th Cir. 2003).

II

The question on appeal is whether the Counties' regulations imposing penalties for tampering with emission control systems in motor vehicles are expressly or impliedly preempted by the CAA's motor vehicle emission standards. We begin with the framework for considering whether Congress has preempted (or displaced) state law. The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "The Clause provides a 'rule of decision' for determining whether federal or state law applies in a particular situation." *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015)). The basic principle is as follows: "If federal law imposes restrictions or confers rights on private actors and a state law confers rights or imposes

restrictions that conflict with the federal law, the federal law takes precedence and the state law is preempted." *Id.* (internal quotation marks omitted) (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1480 (2018)).

Congress may expressly preempt state law by enacting a clear statement to that effect. *Id.* "If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

Congress may also preempt state law implicitly. In discerning whether there is implied preemption, our analysis "must be guided by two cornerstones of . . . pre-emption jurisprudence." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). "First, 'the purpose of Congress is the ultimate touchstone in every pre-emption case.'" *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). We must find such a purpose "grounded 'in the text and structure of the statute at issue.'" *Garcia*, 140 S. Ct. at 804 (quoting *CSX Transp., Inc.*, 507 U.S. at 664). "Second, in all pre-emption cases . . . we start with the assumption that the historic police powers of the States" are not preempted "unless that was the clear and manifest purpose of Congress." *Wyeth*, 555 U.S. at 565 (alteration adopted and internal quotation marks omitted) (quoting *Lohr*, 518 U.S. at 485). Both of these cornerstones support the same analytic approach: "a high threshold must be met" before a court will conclude that a federal law has impliedly preempted a state law. *Whiting*, 563 U.S. at 607 (citation omitted).

The Supreme Court has articulated two circumstances—referred to as "field preemption" and "conflict preemption"—where Congress's implicit intent to preempt state law clears that high threshold. First, "when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation,'" *Murphy*, 138 S. Ct. at 1480 (quoting *R.J. Reynolds Tobacco Co. v. Durham Cty.*, 479 U.S. 130, 140 (1986)), a court may infer that Congress intended to preempt state law.

Second, when a state law "actually conflicts with federal law," *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990), either because "compliance with both state and federal law is impossible," or because "the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100–01 (1989)), a court may again conclude that Congress implicitly intended to preempt state law. To evaluate a claim based on the second type of conflict preemption—referred to as "obstacle preemption"—a court must identify the "full purposes and objectives" of the federal law from "the text and structure of the statute at issue." *Garcia*, 140 S. Ct. at 804 (quoting *CSX Transp., Inc.*, 507 U.S. at 664). "The Supremacy Clause gives priority to 'the Laws of the United States,'" not the priorities and preferences of federal officers, *id.* at 807, or the "unenacted approvals, beliefs, and desires" of Congress, *P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 501 (1988).

The Supreme Court has found obstacle preemption in only a small number of cases. First, where the federal

legislation at issue involved a "uniquely federal area[] of regulation," the Court has inferred a congressional intent to preempt state laws "that directly interfered with the operation of the federal program." *Whiting*, 563 U.S. at 604. Such unique federal areas include exercising foreign affairs powers, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373–74 (2000), sanctioning fraud on a federal agency, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 353 (2001), and regulating maritime vessels, *United States v. Locke*, 529 U.S. 89, 97 (2000). Second, the Court has inferred that Congress made "a considered judgment" or "a deliberate choice" to preclude state regulation when a federal enactment clearly struck a particular balance of interests that would be disturbed or impeded by state regulation. *Arizona*, 567 U.S. at 405. Thus, a state law imposing criminal penalties on aliens who sought or engaged in unlawful employment "would interfere with the careful balance struck by Congress," because "Congress made a deliberate choice not to impose criminal penalties" for the same conduct. *Id.* at 405, 406; *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 879–81 (2000) (holding that certain federal safety regulations "deliberately sought a *gradual* phase-in" of airbags to give manufacturers more time and increase public acceptance, and that state tort law requiring the *immediate* installation of airbags would have "stood as an obstacle" to the phase-in program "that the federal regulation deliberately imposed"); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494, 497 (1987) (holding that the federal statute's comprehensive regulation "carefully addressed" the "balance of public and private interests," giving rise to the inference that Congress did not intend to "tolerate common-law suits that have the potential to undermine this regulatory structure"). Where Congress has determined the appropriate balance, state regulation involving a different method of enforcement may

upset that balance and be displaced by federal law even where the state "attempts to achieve one of the same goals as federal law." *Arizona*, 567 U.S. at 406.

Absent such circumstances, the Supreme Court has frequently rejected claims of obstacle preemption. For instance, the Court does not infer Congress intended to preempt state enactments merely because they overlap with a federal act. "Our federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap, and there is no basis for inferring that federal criminal statutes preempt state laws whenever they overlap." *Garcia*, 140 S. Ct. at 806.

This analysis is equally applicable in the civil context, especially when the federal statute expressly or impliedly preserves state laws that might overlap with a federal statute. *See Whiting*, 563 U.S. at 607. The Court gives great weight to Congress's inclusion of a provision preserving states' enforcement authority. In *Williamson*, for instance, the Court concluded that a federal statute giving manufacturers a choice to select a less effective car safety device did not preempt a state tort suit that could require the manufacturer to select a more effective device. 562 U.S. at 332–36. The Court reasoned that because Congress included "a statutory saving clause" preserving state remedies, it foresaw "the likelihood of a continued meaningful role for state tort law." *Id.* at 335. Similarly, in *Whiting*, the Court concluded that federal law preempting "any State or local law imposing civil or criminal sanctions" on employers who hire "unauthorized aliens," did not impliedly preempt an Arizona law that authorized (and sometimes required) the suspension or revocation of an employer's business license if the employer knowingly or intentionally employed unauthorized aliens. 563 U.S. at 587.

The Court held that there was no express preemption, because the state law fell "comfortably within the saving clause." *Id.* at 596. The Court likewise concluded there was no implied preemption of the Arizona law, because where "Congress specifically preserved such authority for the States, it stands to reason that Congress did not intend to prevent the States from using appropriate tools to exercise that authority." *Id.* at 600–01.

Although a saving clause raises the inference that Congress did not intend to preempt state law, the existence of a saving clause does not "foreclose or limit the operation of ordinary pre-emption principles" that are "grounded in longstanding precedent." *Geier*, 529 U.S. at 869, 874; *see also Buckman*, 531 U.S. at 352 (broadening *Geier*'s specific holding to apply to all saving clauses). We may not interpret a saving clause as preserving a state law that would so conflict and interfere with a federal enactment that it would defeat the federal law's purpose or essentially nullify it; rather, such a state law is preempted under ordinary preemption principles. Said otherwise, we infer that Congress did not intend the saving provisions in a federal law to be interpreted in a way that causes the federal law "to defeat its own objectives, or potentially, as the Court has put it before, to destroy itself." *Geier*, 529 U.S. at 872 (internal quotation marks and citation omitted). But this unremarkable principle means only that a court must interpret a saving clause as it would any statutory language: giving effect to its plain language and meaning in a way that best comports with the statute as a whole. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (explaining that courts must interpret statutes "as a symmetrical and coherent regulatory scheme . . . and fit, if possible, all parts into an harmonious whole" (citation and quotation marks omitted));

*see also* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 180 (2012) ("[T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously.").

### III

We apply these principles to the question whether the Counties' anti-tampering rules are preempted.

### A

Some background is helpful to put our interpretation of the CAA and its relationship with states' laws and police powers into context. The CAA is a joint venture, one that makes "the States and the Federal Government partners in the struggle against air pollution." *Gen. Motors Corp. v. United States*, 496 U.S. 530, 532 (1990). The basic division of responsibility in Title II of the CAA reflects the cooperative federalism principles that have long informed this nation's air pollution control laws. *See Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1173 (9th Cir. 2015) ("[T]he CAA has established a uniquely important system of cooperative federalism in the quest for clean air."); *GenOn REMA, LLC v. EPA*, 722 F.3d 513, 516 (3d Cir. 2013) ("This 'cooperative federalism' structure is a defining feature of the [CAA]."). Prior to 1955, the regulation of air pollution was the sole responsibility of the states as a matter of public health, and the states enacted various regulations pursuant to their historic police powers. *See* Arthur C. Stern, *History of Air Pollution Legislation in the United States*, 32 J. Air Pollution Control Ass'n 44, 44, 47 (1982); *see also, e.g.*, 1947 Cal. Stat. 1640; 1911 Iowa Acts 27; 1887 Minn. Special Laws 623. The federal government first partnered with the states

in the fight against air pollution in 1955, enacting the Air Pollution Control Act and espousing a national policy "to preserve and protect the primary responsibilities and rights of the States and local governments in controlling air pollution." Act of July 14, 1955, Pub. L. No. 84-159, 69 Stat. 322, 322 (1955). In 1963, Congress enacted the first version of the CAA, Act of Dec. 17, 1963, Pub. L. No. 88-206, 77 Stat. 392 (1963), which was "[b]uilt on a scheme of 'cooperative federalism,'" *MacClarence v. EPA*, 596 F.3d 1123, 1125 (9th Cir. 2010).

The current version of the CAA recognizes "that air pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3). In regard to air pollution from motor vehicles, Congress has taken a stronger lead in enforcing emission standards. Nevertheless, it has consistently preserved the legitimacy of state regulations. For instance, although Congress displaced state emission standards for new motor vehicles in 1967, *see* Air Quality Act of 1967, Pub. L. No. 90-148, § 208(a), 81 Stat. 485, 501 (1967); Clean Air Amendments of 1970, Pub. L. No. 91-604, § 8(a), 84 Stat. 1676, 1694 (1970), it has maintained a substantial role for states in post-sale implementation and enforcement ever since, *see* 42 U.S.C. §§ 7416, 7543(d); *see also Ashoff v. City of Ukiah*, 130 F.3d 409, 412–13 (9th Cir. 1997) (describing how the CAA's citizen suit provision enables citizens to "sue on the basis of more stringent state standards"). In sum, the regulation of air pollution falls within the historic police powers of the states, *see Huron Portland Cement Co.*, 362 U.S. at 442, and the modern CAA maintains a cooperative federalism approach, *see Gen. Motors Corp.*, 496 U.S. at 532.

B

We now turn to the relevant text of the CAA. Under Title II, Part A of the CAA, the federal government has authority to establish "standards applicable to the emission of any air pollutant from . . . new motor vehicles." 42 U.S.C. § 7521(a)(1). This includes the authority to set emission limits for air pollutants, § 7521(b), and to promulgate standards governing the use of emission control devices, § 7521(a)(4)(A). Failure to comply with the CAA and regulatory emission standards for new motor vehicles can result in civil penalties, criminal penalties, or both. *See* §§ 7413(c), 7524.

The CAA expressly preempts certain state and local laws regulating emissions from new motor vehicles. Under § 209(a) of the CAA:

> No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a). A "new motor vehicle" is "a motor vehicle the equitable or legal title to which has never been transferred to an ultimate purchaser," § 7550(3), in other

words, a pre-sale vehicle. Although the CAA does not define a "standard relating to the control of emissions," the Supreme Court has provided a definition. *See Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252–53 (2004) ("*South Coast*"). In *South Coast*, the Court first turned to the dictionary to define "standard" as "that which 'is established by authority, custom, or general consent, as a model or example; criterion; test.'" *Id.* (quoting Webster's Second New International Dictionary 2455 (1945)). The Court then stated that "[t]he criteria referred to in § 209(a) relate to the emission characteristics of a vehicle or engine." *Id.* at 253. A vehicle meets the criteria relating to emission characteristics in one of three ways: by not emitting "more than a certain amount of a given pollutant"; by being "equipped with a certain type of pollution-control device"; or by having "some other design feature related to the control of emissions." *Id.* Accordingly, even a requirement "that certain purchasers may buy only vehicles with particular emission characteristics" constitutes an "attempt to enforce" a "standard." *Id.* at 255. In light of this definition, § 209(a) precludes state or local governments from imposing any restriction that has the purpose of enforcing emission characteristics for pre-sale, motor vehicles.

After a new motor vehicle is sold "to an ultimate purchaser," 42 U.S.C. § 7550(3), the express preemption clause no longer applies. Instead, the CAA preserves state and local governments' authority over post-sale motor vehicles. Section 209(d) of the CAA provides: "Nothing in this part shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles." 42 U.S.C. § 7543(d). A vehicle is registered or licensed after sale to a consumer, so the saving

clause applies to post-sale vehicles.[14]   The CAA does not define "operation," so taking *South Coast*'s lead, we look to the dictionary, which defines it as "the quality or state of being functional or operative" or the "method or manner of functioning." *Operation*, Webster's Third New International Dictionary 1518 (2002).  Removing or making inoperable a vehicle's emission control system (i.e., tampering) affects the vehicle's "quality" and "method" of functioning (i.e., operation).    Therefore, the plain language of § 209(d) preserves state and local governments' authority to prohibit tampering with emission control systems in post-sale vehicles.

Despite the saving clause, the EPA retains some authority over post-sale vehicles.  The CAA requires manufacturers of new motor vehicles to warrant the emission control system of the vehicle for the "useful life" of the vehicle, with the useful life being 10 years or 100,000 miles.  42 U.S.C. §§ 7521(d), 7541(a)(1).  Manufacturers must test post-sale vehicles for compliance with EPA emission standards by performing "in-use verification testing" on vehicles obtained from consumers at prescribed mileage intervals.  *See* § 7541(b); 40 C.F.R. § 86.1845–04.  If, pursuant to an EPA mandatory reporting regulation, a manufacturer reports that a "specific emission-related defect exists in twenty-five or more vehicles or engines of the same model year," 40 C.F.R. § 85.1903(a)(2), then the EPA can require the manufacturer to conduct a recall and remedy the defect, all at the manufacturer's expense, 42 U.S.C. § 7541(c), (d).  The EPA also has the authority to require manufacturers to make post-sale "[c]hanges to the

---

[14] *See, e.g.*, Nev. Rev. Stat. § 482.423 (2019) (indicating that the "certificate of registration and license plates for the vehicle" will be issued only after "the sale of a new vehicle").

configuration of vehicles covered by a Certificate of Conformity," including changes to vehicle software. *See* 40 C.F.R. § 86.1842–01(b). Failure to comply with any EPA post-sale regulation can result in civil enforcement actions and other penalties. 42 U.S.C. § 7524.

Last, the CAA prohibits tampering with air pollution control devices in all motor vehicles, both pre-sale and post-sale. *See* § 7522(a)(3)(A), (B).[15] These sections make it a violation of the CAA "for any person to remove or render inoperative" an air pollution control device both before and after "sale and delivery to the ultimate purchaser," or to install a defeat device on any motor vehicle at any time. *Id.* In the event of a tampering violation, the CAA provides for

---

[15] 42 U.S.C. § 7522(a)(3) provides that it shall be unlawful:

(A) for any person to remove or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter prior to its sale and delivery to the ultimate purchaser, or for any person knowingly to remove or render inoperative any such device or element of design after such sale and delivery to the ultimate purchaser; or

(B) for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use.

the imposition of a civil penalty not to exceed $25,000 per vehicle, with additional limitations on penalties for related offenses committed by specified persons. § 7524(a).[16] The EPA can give effect to the CAA's penalty provision through a civil or administrative action. § 7524(b), (c). When imposing a civil penalty through an administrative action, the EPA must "take into account" a range of factors, including "the gravity of the violation, the economic benefit or savings (if any) resulting from the violation, the size of the violator's business, the violator's history of compliance with this subchapter, action taken to remedy the violation, the effect of the penalty on the violator's ability to continue in business,

---

[16] 42 U.S.C. § 7524(a) provides:

> Any person who violates sections 7522(a)(1), 7522(a)(4), or 7522(a)(5) of this title or any manufacturer or dealer who violates section 7522(a)(3)(A) of this title shall be subject to a civil penalty of not more than $25,000. Any person other than a manufacturer or dealer who violates section 7522(a)(3)(A) of this title or any person who violates section 7522(a)(3)(B) of this title shall be subject to a civil penalty of not more than $2,500. Any such violation with respect to paragraph (1), (3)(A), or (4) of section 7522(a) of this title shall constitute a separate offense with respect to each motor vehicle or motor vehicle engine. Any such violation with respect to section 7522(a)(3)(B) of this title shall constitute a separate offense with respect to each part or component. Any person who violates section 7522(a)(2) of this title shall be subject to a civil penalty of not more than $25,000 per day of violation.

and such other matters as justice may require."
§ 7524(c)(2).[17]

IV

We now consider the application of the preemption doctrine to the Counties' anti-tampering rules. We first ask whether the CAA's express preemption provision preempts the Counties' anti-tampering rules. To the extent the CAA's express preemption provision does not apply, we ask whether the Counties' rules conflict with the CAA, and therefore are impliedly preempted. *See Williamson*, 562 U.S. 329–30.

A

Volkswagen argues that § 209(a), the CAA's express preemption provision, preempts the Counties' imposition of anti-tampering rules on pre-sale vehicles. We agree. Section 209(a) precludes a local government from enforcing "any standard relating to the control of emissions from new motor vehicles." 42 U.S.C. § 7543(a). The Counties seek to enforce rules prohibiting persons from making changes to a motor vehicle's emission control system. *See* Rules of Envtl. Prot. Comm'n of Hillsborough Cty., Rule 1-8.05(1); Utah Admin. Code R. 307-201-4. The EPC additionally seeks to enforce a rule prohibiting the installation of any device designed "to defeat or render inoperable any component of a motor vehicle's emission control system." Rules of Envtl. Prot. Comm'n of Hillsborough Cty., Rule 1-8.05(6). Because these requirements relate to the emission control system of a

---

[17] When the EPA initiates a civil action, the district court must "take into account" the same range of factors when assessing a penalty. 42 U.S.C. § 7524(b).

vehicle, they constitute standards for purposes of § 209(a). Therefore, § 209(a) preempts the Counties' enforcement of these rules with respect to new motor vehicles. *See* 42 U.S.C. § 7543(a).

The Counties argue that their anti-tampering rules are not "emission standards" for purposes of § 209(a) because they do not attempt to enforce the limitations on emissions of pollutants from new motor vehicles that are set forth in § 202 of the CAA, 42 U.S.C. § 7521 (emission standards for new motor vehicles). In the same vein, the Counties argue that the anti-tampering rules are not "standard[s] relating to the control of emissions" because they merely prohibit tampering with emission control systems. According to the Counties, these anti-tampering rules do not relate to the control of emissions because "[a] vehicle does not have to exceed emission standards for a tampering violation to occur; a violation occurs whenever there is 'the act of removing or rendering inoperative any emission control device or element of design.'" These arguments fail, because *South Coast* defined "standard" as denoting not only "numerical emission levels with which vehicles or engines must comply, *e.g.*, 42 U.S.C. § 7521(a)(3)(B)(ii)," but also "emission-control technology with which they must be equipped, *e.g.*, § 7521(a)(6)." *South Coast*, 541 U.S. at 253. Because the Counties' rules attempt to enforce the integrity of "the emission-control technology with which" the pre-sale vehicles must be equipped, *id.*, they attempt to enforce a "standard," and are therefore preempted by § 209(a).

B

We turn to Volkswagen's argument that § 209(a) also expressly preempts the Counties' anti-tampering rules as

applied to post-sale vehicles. It clearly does not. By its terms, § 209(a) preempts state and local regulations "relating to the control of emissions from *new* motor vehicles." 42 U.S.C. § 7543(a) (emphasis added). The provision does not apply to post-sale vehicles.

Nevertheless, Volkswagen argues that the preemptive effect of § 209(a) does not end as soon as the "equitable or legal title" to a vehicle has "been transferred to an ultimate purchaser." § 7550(3). According to Volkswagen, a long line of federal authority recognizes that § 209(a) would be a dead letter if a state or local government could impose a different emission standard the moment after title is transferred to a purchaser. In the leading case of *Allway Taxi, Inc. v. City of New York*, a district court upheld a local ordinance requiring licensed taxicabs to use a certain type of gasoline and to be equipped with an emission control device, but stated that a state or locality is not necessarily "free to impose its own emission control standards the moment after a new car is bought and registered" because that "would be an obvious circumvention of the Clean Air Act and would defeat the congressional purpose of preventing obstruction to interstate commerce." 340 F. Supp. 1120, 1124 (S.D.N.Y. 1972). Volkswagen further notes that the EPA cited *Allway Taxi* with approval in the preamble to a regulation, stating that the "EPA expects that the principles articulated in *Allway Taxi* will be applied by the courts." Control of Air Pollution, 59 Fed. Reg. 31306, 31330 (June 17, 1994).

Volkswagen's reliance on *Allway Taxi* is misplaced. The Counties' anti-tampering rules do not require Volkswagen to comply with a local emission standard that is different from the federal standard, nor do they impose a standard that would effectively require car manufacturers to alter their

manufacture of new vehicles before sale. Rather, the anti-tampering rules prohibit post-sale tampering with federally mandated emission control systems. In this context, the Counties can regulate Volkswagen's post-sale tampering with vehicles' emission control systems to make them less effective just as it can penalize the local garage mechanic who disconnects vehicles' emission control devices to improve performance or gas mileage. Such an exertion of authority is not expressly preempted by § 209(a).

V

Because we reject Volkswagen's argument that § 209 of the CAA expressly preempts the Counties' anti-tampering rules as applied to post-sale vehicles, we turn to the more difficult question raised by the parties: whether the CAA impliedly preempts the Counties' anti-tampering rules as applied to post-sale vehicles.

Volkswagen's theory of implied preemption is based only on the doctrine of obstacle preemption.[18] Specifically, Volkswagen claims that the Counties' anti-tampering rules stand "as an obstacle to the accomplishment and execution of the full purposes and objectives" of Title II, Part A of the CAA, and therefore they are impliedly preempted. *Oneok*, 575 U.S. at 377 (quoting *ARC Am. Corp.*, 490 U.S. at 100–01).

---

[18] Volkswagen does not argue that Congress intended to occupy the field of emission regulations, nor could it, given that Congress contemplated that state and local governments would play a role in implementing the motor vehicle controls mandated by the CAA. *See* 42 U.S.C. § 7416. Nor does Volkswagen argue that it is impossible to comply with both state and federal regulations, given that § 7522(a)(3)(A) and the Counties' anti-tampering rules prohibit the same conduct.

In considering Volkswagen's obstacle preemption arguments, we begin with the text and structure of the CAA. *See Garcia*, 140 S. Ct. at 804. As directed by the Supreme Court, we consider the impact of Congress's inclusion of a saving clause, *see Williamson*, 562 U.S. at 335; *Whiting*, 563 U.S. at 600–01, in light of the presumption "that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress,'" *Arizona*, 567 U.S. at 400 (citation omitted).

The CAA's preemption clause (§ 209(a)) and saving clause (§ 209(d)) allocate authority between the federal government and state governments as follows: Section 209(a) gives the EPA exclusive authority to establish standards for new vehicles, 42 U.S.C. § 7543(a), while § 209(d) preserves the authority of state and local governments over post-sale vehicles, 42 U.S.C. § 7543(d). The plain language of § 209(d), providing that nothing in Title II "shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles," appears to give states substantial authority to enforce standards related to post-sale vehicles, including sanctioning tampering with emission control systems. *Id.*; *see also Whiting*, 563 U.S. at 611 (holding that Congress's express reservation of state authority to impose certain civil sanctions means what it says). The language of § 209(d) also indicates that Congress foresaw "the likelihood of a continued meaningful role" for state enforcement. *Williamson*, 562 U.S. at 335. Indeed, the vast majority of states have laws prohibiting tampering with air pollution

control systems in motor vehicles.[19]  We may presume that Congress was aware of these laws and did not intend to displace them, given that many of these state laws existed during the period in which Congress amended the CAA without making any changes to the preservation of state authority.[20]  *See, e.g.*, Wis. Admin. Code NR § 154.17(2) (1972); Mont. Admin. R. 17.8.325 (effective Dec. 31, 1972);

---

[19] *See* Ala. Admin. Code r. 335-3-9.06; Alaska Admin. Code tit. 18, § 52.015; Ariz. Rev. Stat. Ann. § 28-1522; Ark. Admin. Code 014.01.5-7; Cal. Code Regs. tit. 16, § 3362.1; Colo. Rev. Stat. § 42-4-314; Conn. Gen. Stat. Ann. § 14-164c; Del. Code Ann. tit. 21, § 6701; D.C. Mun. Regs. tit. 18, § 750; Fla. Stat. Ann. § 316.2935; Ga. Code Ann. § 40-8-130; Haw. Code R. § 11-60.1-34; Idaho Code Ann. § 49-229; Ill. Admin. Code tit. 35, § 240.103; 326 Ind. Admin. Code 13-2.1-3; Iowa Code Ann. § 321.78; La. Admin. Code tit. 55,§ 817; Md. Code Ann. Transp. § 22-402.1; 310 Mass. Code Regs. 60.02; Mich. Comp. Laws Ann. §§ 324.6504, 324.6535; Minn. R. 7023.0120; Mo. Code Regs. Ann. tit. 10, § 10-5.381; Mont. Admin. R. 17.8.325; 129 Neb. Admin. Code Ch. 36, § 001; Nev. Admin. Code § 445B.575; N.H. Code Admin. R. Env-A 1102.01; N.J. Admin. Code § 7:27–15.7; N.Y. Comp. Codes R. & Regs. tit. 6, § 218-6.2; 19a N.C. Admin. Code 3D.0542; N.D. Admin. Code 33.1-15-08-02; Ohio Admin. Code 3745-80-02; Okla. Stat. Ann. tit. 47, § 12-423; Or. Rev. Stat. Ann. § 815.305; 75 Pa. Stat. and Cons. Stat. Ann. § 4531; 280-30 R.I. Code R. § 1.13.2; S.C. Code Ann. § 16-21-90; Tenn. Comp. R. & Regs. 1200-03-36-.03; 30 Tex. Admin. Code § 114.20; Utah Admin. Code r. R307-201-4; 16-5 Vt. Code R. § 702; 9 Va. Admin. Code § 5-40-5670; Wash. Admin. Code § 173-421-100; W. Va. Code Ann. § 22-5-15; Wis. Admin. Code NR § 485.06; 20.0002-13 Wyo. Code R. § 2.

[20] Congress amended the CAA three times since enacting the saving clause in 1967, *see* Clean Air Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676 (1970); Clean Air Act Amendments of 1977, Pub. L. No. 95-95, 91 Stat. 685 (1977); Clean Air Act, Amendments, Pub. L. No. 101-549, 104 Stat. 2399 (1990), but the language of the saving clause has never changed, *see* Air Quality Act of 1967, Pub. L. No. 90-148, § 208(c), 81 Stat. 485, 501 (1967), renumbered at 84 Stat. at 1694, and codified at 42 U.S.C. § 7543(d).

*see also Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988) ("[Courts] generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.").[21]    Congress's "certain awareness of the prevalence of state" law, coupled with its "silence on the issue," "is powerful evidence that Congress did not intend" to preempt local anti-tampering laws. *Wyeth*, 555 U.S. at 575; *see also Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166–67 (1989) ("The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to 'stand by both concepts and to tolerate whatever tension there is between them.'" (alteration adopted and citation omitted); *Head v. N.M. Bd. of Exam'rs in Optometry*, 374 U.S. 424, 432 (1963) (holding that a state law did not stand "as an obstacle to the full effectiveness of the federal statute" because the federal government "apparently viewed state regulation of advertising as complementing its regulatory function, rather than in any way conflicting with it"). Accordingly, the CAA's text and structure, particularly in light of the presumption that Congress does not impliedly preempt states' historic police powers, weigh against a conclusion that

---

[21] To the extent we give weight to the EPA's interpretation of the CAA in this context, it is clear that the EPA did not read the CAA as preempting the states' enforcement efforts.    *See* Approval and Promulgation of Air Quality State Implementation Plans (SIP), 63 Fed. Reg. 6651-01, 6652 (Feb. 10, 1998) ("Even though there is a federal [anti-tampering] law which provides for EPA enforcement, many states [have enacted anti-tampering laws] and use them successfully as enforcement tools for resolutions of consumer complaints involving tampered vehicles, deterrence of tampering, deterrence of selling tampered vehicles, and enforcement of tampering violations."). We note, once again, that the EPA declined to provide its opinion on this issue. *See supra* at 8 n.4.

Congress intended to preempt the Counties' anti-tampering rules.

Nor are there other factors weighing in favor of obstacle preemption. The regulation of air pollution from post-sale vehicles does not involve a "uniquely federal" area of enforcement, *Whiting*, 563 U.S. at 604, because the basic division of responsibility in Title II of the CAA reflects the cooperative federalism principles that have long informed this nation's air pollution control laws, *see supra* Part III.A. And even if the regulation of post-sale vehicles were an important area of federal concern, the EPA's ability to enforce the federal anti-tampering law, 42 U.S.C. § 7522(a)(3)(A), is not impeded by the Counties' parallel rules, and so there is no basis to infer a congressional intent to preempt them. *See Whiting*, 563 U.S. at 605 (holding that a state law regulating unauthorized alien employment did not interfere with federal immigration law where the federal program "operates unimpeded by the state law"). We also see no indication that Congress struck a balance in the enforcement of post-sale emission standards that would be upset by state anti-tampering rules. Unlike *Arizona* and *Geier*, where Congress "deliberately sought" a particular policy goal at the expense of others, *Geier*, 529 U.S. at 879; *see also Arizona*, 567 U.S. at 405, the text and structure of the CAA expresses a general policy to prohibit tampering by "any person" at any time. § 7522(a)(3)(A). Faced with such a generalized congressional objective, and the fact that Congress does not occupy the field of post-sale emission regulations, *see supra* at 34 n.18, we cannot infer that Congress made a "deliberate choice" to preclude state regulations that overlap with federal law. *Arizona*, 567 U.S. at 405.

Accordingly, we conclude that Congress intended to allow states to enforce anti-tampering rules related to post-sale vehicles, and that such rules are not impliedly preempted.

VI

Despite the strong indications that Congress did not intend to preempt state efforts to prevent tampering in post-sale vehicles, Volkswagen argues that interpreting the CAA as allowing such state enforcement efforts would defeat the "purposes and objectives of Congress." *Oneok*, 575 U.S. at 377 (citation omitted). Therefore, Volkswagen asserts, the Counties' anti-tampering rules are preempted under ordinary preemption principles. Volkswagen relies on two distinct aspects of Title II to support its argument: (1) the provisions requiring manufacturers to ensure that post-sale vehicles comply with certain emission requirements on a model-wide basis, and (2) the provisions authorizing the EPA to impose civil penalties on persons who tamper with vehicles. We consider each of these arguments in turn.

A

Volkswagen first argues that Congress intended to give the EPA exclusive oversight over post-sale compliance with emission standards on a model-wide basis, and the Counties' anti-tampering rules pose an obstacle to this goal.[22]

---

[22] Volkswagen claims that the legislative history of the CAA supports this theory because it indicates that Congress wanted to avoid a patchwork of varying emission standards for vehicles nationwide, further supporting its argument that the Counties' anti-tampering rules are preempted. Even if we consider this legislative history, however, it is inapplicable here. The Counties' rules (just like every other state anti-tampering rule) do not impose unique emission standards; rather, they permit local governments

Volkswagen's argument proceeds in three steps. First, Volkswagen points to the sections of the CAA imposing post-sale obligations on manufacturers and tasking the EPA with ensuring compliance with those obligations. For instance, the CAA requires manufacturers to ensure that their vehicles' emission control system remains functional for at least 10 years or 100,000 miles, *see* 42 U.S.C. §§ 7521(a)(1), (d), 7541(a)(1), (b), and to conduct a recall if certain model-wide defects are detected, *see* § 7541(c), (d). Second, Volkswagen acknowledges that the CAA's saving clause preserves some state enforcement authority over post-sale vehicles. Finally, Volkswagen argues that the only way to harmonize the saving clause with the EPA's post-sale enforcement responsibilities is to conclude that Congress intended the EPA to regulate post-sale emission standards on a model-wide basis at the manufacturer level without any interference from the states, and that Congress also intended the states to enforce the same standards only on an individual-vehicle basis at the end-user level. In other words, Volkswagen claims that Congress intended to prevent state and local governments from enforcing their anti-tampering rules against manufacturers that engage in post-sale tampering on a model-wide basis. The district court concluded that such a division of authority between the federal and state governments would be sensible because the EPA was in a better position to regulate tampering when such conduct "involves thousands of

---

to prohibit and penalize tampering with approved emission control systems, which is exactly what the federal anti-tampering law prohibits. The existence of identical federal and local laws would not, as the district court put it, "create nightmares for the manufacturers." Therefore, Volkswagen's concern about a patchwork of varying anti-tampering rules is unwarranted. And as the Supreme Court has instructed, a mere overlap in federal and state laws does not, without more, raise the inference that Congress intended to preempt the state laws. *Garcia*, 140 S. Ct. at 806.

vehicles, and the changes are made through software updates instituted on a nationwide basis."

We disagree. Whether such a division of labor is reasonable from a policy perspective (or is merely a reading of the CAA tailored to fit Volkswagen's unique circumstances), this theory of partial preemption is not "grounded in the text and structure" of the CAA. *Garcia*, 140 S. Ct. at 804 (citation and internal quotation marks omitted). Nothing in the CAA raises the inference that Congress intended to place manufacturers beyond the reach of state and local governments. Volkswagen itself concedes that the CAA does not afford "a wide-ranging grant of immunity [from state enforcement actions] based on the identity of the actor (auto manufacturers)." As the district court put it, if "a manufacturer were to tamper with a single in-use vehicle during vehicle maintenance, the Clean Air Act would not bar a state or local government from bringing a tampering claim against the manufacturer if the tampering occurred within its borders." Nor does anything in the text or structure of the CAA raise the inference that Congress intended to shield a person from state enforcement actions if that person tampered with a large number of vehicles or engaged in systematic rather than sporadic tampering. The CAA prohibits "any person" from tampering with an emission control device, manufacturers and dealers and local mechanics alike. 42 U.S.C. § 7522(a)(3)(A). And contrary to Volkswagen's assertion, the CAA does not classify tampering by reference to its scope. *See id.* Indeed, the CAA is entirely silent on this issue, probably because Congress did not contemplate that a manufacturer would systematically tamper with emission control devices on post-sale vehicles in order to ensure the devices were effectively (and illegally) disabled. Thus, there is little textual evidence from which we

can infer that Congress made "a deliberate choice" to shield such a manufacturer from state enforcement actions. *Arizona*, 567 U.S. at 405.

In short, we cannot discern a congressional intent, let alone a "clear and manifest purpose of Congress," to give the EPA exclusive authority over large-scale, post-sale tampering by manufacturers, while giving state and local governments concurrent authority only when the tampering is conducted on a more casual, individual basis. *Id.* at 400. Because we see no indication that Congress intended to preempt state and local authority to enforce anti-tampering rules on a model-wide basis, we reject Volkswagen's argument that interpreting § 209(d) according to its terms would cause the CAA to "destroy itself." *Geier*, 529 U.S. at 872 (citation omitted).

B

Volkswagen next argues that the CAA's penalty provision, 42 U.S.C. § 7524, shows that Congress struck a balance of interests with respect to the imposition of penalties, and this balance would be disturbed if states could impose their own penalties for tampering with post-sale vehicles. By including a penalty provision in Title II of the CAA, so the argument goes, Congress intended the EPA to have the exclusive authority to determine the appropriate penalty for every tampering violation. Therefore, the potential for any state penalties (large or small) "would seriously undermine the congressional calibration of force."

To support its claim that the CAA gives the EPA exclusive authority over the imposition of penalties, Volkswagen first relies on a line of cases interpreting the

National Labor Relations Act as preventing states from imposing any remedies for activities potentially covered by the Act. *See San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236 (1959); *Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274 (1971); *Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282 (1986). Volkswagen's reliance is misplaced, because those cases involved a "special preemption rule" applicable to "state laws regulating matters that the National Relations Act 'protects, prohibits, or arguably protects.'" *Garcia*, 140 S. Ct. at 807 (quoting *Gould*, 475 U.S. at 286). *Garmon* and its progeny are based on "a presumption of federal preemption," *Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Local 54*, 468 U.S. 491, 502 (1984), "designed to prevent 'conflict in its broadest sense' with the 'complex and interrelated federal scheme of law, remedy, and administration'" of the National Labor Relations Act, *Gould*, 475 U.S. at 286 (quoting *Garmon*, 359 U.S. at 243). The Supreme Court has declined to extend this rule to other contexts. *See Garcia*, 140 S. Ct. at 807 (rejecting the argument that such a rule is "operative or appropriate" in a context not involving the National Labor Relations Act). And it is clearly not applicable here, where the federal law makes "the States and the Federal Government partners in the struggle against air pollution," *Gen. Motors Corp.*, 496 U.S. at 532, and where we assume that Congress did not intend to displace the historic police powers of the states.

Volkswagen also offers textual arguments to support its claim. First, Volkswagen points to the list of factors the EPA "shall take into account" before assessing a civil administrative penalty. 42 U.S.C. § 7524(c)(2). According to Volkswagen, those factors evince "the clear and manifest

purpose of Congress" to vest in the EPA the exclusive authority to penalize post-sale tampering, *Arizona*, 567 U.S. at 400, because those factors indicate that the EPA has discretion to determine the appropriate punishment. Volkswagen also suggests that "it would be virtually impossible for the EPA to strike its preferred balance in quantifying a penalty" if states were allowed to enforce their own anti-tampering laws independently, because the EPA would have no control over the total amount of penalties actually imposed. Second, Volkswagen points to the CAA's penalty ceiling, which places a cap on federal penalties for tampering, as evidence that Congress intended to preclude states from enforcing their own anti-tampering rules, or at least the penalty components of those rules. *See* § 7524(a) (limiting the penalties for tampering to no more than $25,000 per vehicle, with additional limitations for related offenses committed by specified persons). If states could independently impose penalties, Volkswagen argues, the penalty cap would be meaningless.

These arguments fail. An exclusive federal regime (such as the regime created by the National Labor Relations Act, as explained in *Garmon* and its progeny) may preclude the imposition of state penalties. But the mere fact that a federal statute permits the imposition of federal penalties, without more, does not raise the inference that Congress created an exclusive federal regime. Because the CAA is, and always has been, a cooperative-federalism partnership, *see supra* Part III.A., there is no basis for Volkswagen's argument that Congress's authorization of federal penalties, along with guidance on how those penalties should be imposed, expressly or impliedly forecloses state and local governments from enforcing their own rules or imposing sanctions of their choosing. To the contrary, the statutory provisions guiding

the EPA in developing an appropriate penalty, including the non-exhaustive list of assessment factors and the penalty cap, are directed only at the EPA; there is no suggestion that Congress wanted to exclude state and local anti-tampering remedies. While this gives the EPA the authority to control only the amount of the federal penalty, we see nothing inherently problematic about the EPA's inability to control the total liability that may be imposed for a tampering violation. The potential for overlapping state and federal penalties has never, without more, raised the inference that Congress intended to preempt state law. *See Garcia*, 140 S. Ct. at 806; *California v. Zook*, 336 U.S. 725, 737 (1949).[23]

In fact, the text and structure of the CAA provides greater support to the Counties. "Given that Congress specifically preserved" the states' authority to engage in post-sale enforcement, *see* § 7543(d), "it stands to reason that Congress did not intend to prevent the States from using appropriate tools to exercise that authority." *Whiting*, 563 U.S. at 600–01. Indeed, a determination that the CAA did *not* preserve state enforcement of anti-tampering rules as applied to post-sale vehicles would be inconsistent with the congressional framework. For example, if the CAA's penalty provision preempted state and local governments from imposing *any* penalty for post-sale tampering, then the EPA

---

[23] Volkswagen appears to argue that because Congress listed certain factors that the EPA "shall take into account" when determining the appropriate federal penalty, but did not require the EPA to consider the possibility that states might enforce their own anti-tampering rules, we must infer that Congress intended to give the EPA exclusive authority to penalize tampering. In other words, Volkswagen wants us to presume that Congress intends to displace state enforcement authority unless it expressly preserves it. This argument turns the presumption that Congress intends to preserve historic police powers on its head, and we reject it.

would be the sole enforcement authority for *every* incident of tampering with air pollution control equipment, including illegal alterations by the local garage mechanic or do-it-yourself efforts to disable a catalytic converter.[24] But nothing in the CAA suggests that Congress intended the EPA to take over such local law enforcement issues, to the exclusion of state and local governments, which would have the effect of preempting anti-tampering rules in nearly every state. *See supra* at 35–36 & n.19. The Supreme Court has warned against "setting aside great numbers of state statutes to satisfy a congressional purpose which would be only the product of [judicial] imagination." *Zook*, 336 U.S. at 732–33. Given the prevalence of state anti-tampering rules, we are especially mindful of the Court's warning.

In sum, the CAA's cooperative federalism scheme, its express preservation of state and local police powers post sale, and the complete absence of a congressional intent to vest in the EPA the exclusive authority to regulate every incident of post-sale tampering, raises the strong inference that Congress did not intend to deprive the EPA "of effective aid from local officers experienced in the kind of enforcement necessary to combat" the evil of tampering with emission control systems. *Id.* at 737. Therefore, Volkswagen's penalty-provision arguments are not sufficient to pass over the "high threshold" which "must be met if a state law is to be

---

[24] As the district court correctly explained, in 1990, Congress expanded the scope of its anti-tampering provision to include individuals, as well as manufacturers, dealers, service operators, and local mechanics. *Compare* Clean Air Act, Amendments, Pub. L. No. 101-549 § 228(b), 104 Stat. 2399 (1990), *with* Clean Air Act Amendments of 1977, Pub. L. 95-95 § 219(a), 91 Stat. 685 (1977). Notably, there is nothing in the 1990 amendments that would indicate a congressional intent to make the EPA the sole enforcer of tampering.

preempted for conflicting with the purposes of a federal Act." *Whiting*, 563 U.S. at 607 (citation omitted).

\*\*\*

We affirm the district court's dismissal of the Counties' complaints to the extent they sought to apply anti-tampering rules to new motor vehicles. However, we reverse the district court's dismissal of the Counties' complaints regarding post-sale tampering. We are mindful that our conclusion may result in staggering liability for Volkswagen. But this result is due to conduct that could not have been anticipated by Congress: Volkswagen's intentional tampering with post-sale vehicles to increase air pollution. We assume that this conduct will be as rare as it is unprecedented. In any event, we may not strain our application of the Supreme Court's preemption doctrine, or our interpretation of statutory language, to avoid this outcome. "Ordinarily, state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law, and no clear purpose of Congress indicates that we should decide otherwise in this case." *ARC Am. Corp.*, 490 U.S. at 105 (citation omitted).

**AFFIRMED IN PART; REVERSED IN PART.[25]**

---

[25] Each party shall bear its own costs.