[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Yost v. Volkswagen Aktiengesellschaft*, Slip Opinion No. 2021-Ohio-2121.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2021-OHIO-2121

THE STATE EX REL. YOST, ATTY. GEN., APPELLEE, *v.* VOLKSWAGEN AKTIENGESELLSCHAFT, D.B.A. VOLKSWAGEN GROUP AND/OR VOLKSWAGEN AG, ET AL., APPELLANTS.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Yost v. Volkswagen Aktiengesellschaft*, Slip Opinion No. 2021-Ohio-2121.]

*Federal preemption—Vehicle-emissions anti-tampering claims—The federal Clean Air Act neither expressly nor impliedly preempts R.C. 3704.16(C)(3) or precludes an anti-tampering claim against a vehicle manufacturer under Ohio's Air Pollution Control Act for the manufacturer's post-sale tampering with a vehicle's emissions-control system—Court of appeals' judgment affirmed.*

(No. 2020-0092—Submitted January 26, 2021—Decided June 29, 2021.)

APPEAL from the Court of Appeals for Franklin County,

No. 19AP-7, 2019-Ohio-5084.

_____

**FISCHER, J.**

{¶ 1} In this case, we are asked to decide whether the federal Clean Air Act, 42 U.S.C. 7401 et seq., preempts Ohio law and precludes an anti-tampering claim under Ohio's Air Pollution Control Act, R.C. 3704.01 et seq. For the reasons that follow, we hold that it does not and therefore affirm the judgment of the Tenth District Court of Appeals.

## I.  BACKGROUND

{¶ 2} Starting around 2009, appellant Volkswagen Aktiengesellschaft, d.b.a. Volkswagen Group and/or Volkswagen AG ("Volkswagen"),[1] programmed vehicles manufactured and sold under its various labels with software that would enable those vehicles to perform better than they otherwise would have on federal emissions tests. The software, sometimes referred to as a "defeat device," would identify when a Volkswagen vehicle was being tested by regulators for compliance with federal emissions standards. Once the software detected that an emissions test was in progress, the software would trigger equipment within the vehicle that would reduce the vehicle's emissions to an acceptable level. In reality, of course, emissions from the vehicle during everyday driving, i.e., under non-test conditions, were well above the federally imposed legal limit.

{¶ 3} Several years into that scheme, Volkswagen learned that its emissions-control software was not working properly and was causing certain performance problems in its vehicles. Volkswagen updated the software to fix those problems and to continue skirting federal emissions standards. Starting around 2013, Volkswagen installed the improved and updated software in new

---

1. Other defendants named in the complaint and appellants here are Audi AG; Volkswagen Group of America, Inc., d.b.a. Volkswagen of America, Inc., or Audi of America, Inc.; Volkswagen of America, Inc.; Audi of America, L.L.C.; Dr. Ing. h.c. F. Porsche AG, d.b.a. Porsche AG; and Porsche Cars North America, Inc.

vehicles slated for sale in the United States. Without telling its customers the true reason why, Volkswagen also installed the updated software in its older vehicles through a voluntary recall program and when its customers brought their vehicles in for routine maintenance.

{¶ 4} Eventually, the United States Environmental Protection Agency ("EPA") discovered Volkswagen's scheme. In a subsequent enforcement action, Volkswagen admitted to all of this and agreed to pay a $2.8 billion penalty in connection with its wrongdoing.

{¶ 5} In 2016, then Ohio Attorney General Mike DeWine sued Volkswagen for its vehicle-emissions tampering, alleging that Volkswagen's conduct, which impacted approximately 14,000 vehicles that had been sold or leased in Ohio, violated Ohio's Air Pollution Control Act, R.C. 3704.01 et seq. As relevant here, Volkswagen moved to dismiss the attorney general's claims on the grounds that Ohio's anti-tampering statute was preempted by the federal Clean Air Act, 42 U.S.C. 7401 et seq., and that the attorney general's claims were therefore precluded. The trial court agreed with Volkswagen's preemption argument and granted Volkswagen's motion to dismiss.

{¶ 6} On appeal to the Tenth District, appellee, Ohio Attorney General Dave Yost,[2] argued that the trial court erred when it determined that federal preemption principles barred the state's claims against Volkswagen, because the federal Clean Air Act draws a critical distinction between new and used vehicles. While the attorney general conceded below that federal law alone governs emissions from new vehicles, he argued that the federal legislative scheme does not preempt Ohio law and preclude state-based claims concerning *post-sale* tampering with a vehicle's emissions-control system.

---

2. Attorney General Yost was substituted for former Attorney General DeWine as a party during the appeal below to the Tenth District. *See* App.R. 29(C)(1).

{¶ 7} The Tenth District agreed with the attorney general, concluding that the federal Clean Air Act evinces "no clear and manifest congressional purpose to [expressly or impliedly] preempt the State's in-use motor vehicle emission control system tampering claims."  2019-Ohio-5084, 137 N.E.3d 1267, ¶ 29.  As a result, the court of appeals reversed the trial court's judgment and remanded the matter for further proceedings.  *Id.* at ¶ 35.

{¶ 8} Following the Tenth District's decision, Volkswagen appealed to this court and we accepted its appeal to consider whether the federal Clean Air Act either expressly or impliedly preempts state-law claims against a manufacturer for its post-sale emissions control tampering. *See* 158 Ohio St.3d 1450, 2020-Ohio-1090, 141 N.E.3d 985.

## II.  ANALYSIS

### A.  Federal Preemption

{¶ 9} Before turning to whether federal law expressly or impliedly preempts Ohio's anti-tampering law and precludes the state-law claims involved here, it is helpful to review some basic principles regarding federal preemption.

{¶ 10} The doctrine of federal preemption originates from the Supremacy Clause of the United States Constitution, which provides that the "the Laws of the United States * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  Article VI, cl. 2.

{¶ 11} Under the Supremacy Clause, the United States Congress has the power to preempt state law.  *In re Miamisburg Train Derailment Litigation*, 68 Ohio St.3d 255, 259, 626 N.E.2d 85 (1994); *see also Gibbons v. Ogden*, 22 U.S. 1, 210-211, 6 L.Ed. 23 (1824) ("the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it").  Congress may do so either expressly or impliedly.  *Kansas v. Garcia*,

___U.S. ___, 140 S.Ct. 791, 801, 206 L.Ed.2d 146 (2020); *Girard v. Youngstown Belt Ry. Co.*, 134 Ohio St.3d 79, 2012-Ohio-5370, 979 N.E.3d 1273, ¶ 14.

{¶ 12} When Congress expressly preempts state law, it explicitly says so with clear statutory language. *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). When considering whether preemption is implied, courts look to congressional intent to determine whether Congress meant to preempt state law without saying as much. *See id.* at 79. Identifying implied preemption is thus a little more complicated than identifying express preemption, but courts generally find this type of preemption in two circumstances.

{¶ 13} The first circumstance occurs when Congress has enacted a legislative and regulatory scheme that is so pervasive " 'that Congress left no room for the States to supplement it' " or when the legislative and regulatory scheme " 'touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " (Brackets added in *English*.) *Id.*, quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). Implied preemption of this variety is referred to as "field preemption." *English* at 79. Volkswagen has not presented a field-preemption argument here, so we focus our analysis on the second type of implied preemption, which is discussed below.

{¶ 14} The second circumstance in which implied preemption is found occurs when a state law "actually conflicts with federal law." *Id.* This type of implied preemption is fittingly referred to as "conflict preemption." *Id.* at fn. 5. Conflict preemption may be broken down further into subcategories depending on whether the conflict exists because (1) compliance with both state and federal law is impossible, *id.* at 79, citing *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), or (2) the state law " 'stands as an obstacle to the accomplishment and execution of the full purposes

and objectives of Congress,' " *id.*, quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

### B. Standard of Review

{¶ 15} Because the "purpose of Congress is the ultimate touchstone," *Retail Clerks v. Internatl. Assn., Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963), preemption—whether express or implied—is primarily a question of legislative intent and so our focus is on the text and structure of the provisions involved. *Ohio State Bldg. & Constr. Trades Council v. Cuyahoga Cty. Bd. of Commrs.*, 98 Ohio St.3d 214, 2002-Ohio-7213, 781 N.E.2d 951, ¶ 46; *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978). Preemption is thus a question of law, *Pinchot v. Charter One Bank, F.S.B.*, 99 Ohio St.3d 390, 2003-Ohio-4122, 792 N.E.2d 1105, ¶ 39, and we conduct a de novo review of a judgment that was based on preemption grounds. *See Menorah Park Ctr. for Senior Living v. Rolston*, ___ Ohio St.3d ___, 2020-Ohio-6658, ___ N.E.3d ___, ¶ 12.

### C. The Federal Clean Air Act and Ohio's Air Pollution Control Act

*1. The Federal Clean Air Act Does Not Expressly Preempt Ohio's Vehicle-Emissions Anti-Tampering Law and Preclude the Attorney General's Claims*

{¶ 16} When it comes to preemption, Section 209 of the federal Clean Air Act expressly provides that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part." 42 U.S.C. 7543(a).

{¶ 17} Volkswagen contends that the Ohio statute at issue here, R.C. 3704.16(C)(3), is expressly preempted by 42 U.S.C. 7543(a) and that the attorney general's claims are precluded as a result. Specifically, Volkswagen asserts that by prohibiting states from adopting or enforcing standards relating to emissions from new motor vehicles and new motor-vehicle engines, Congress has expressly

precluded states from regulating anything relating to a vehicle's emissions-control system in any way, including post-sale tampering by the manufacturer. We disagree.

{¶ 18} Congress has told us exactly what it meant to include within the scope of the Clean Air Act's express-preemption provision in 42 U.S.C. 7543(a): "new motor vehicles" and "new motor vehicle engines." It has also defined both of those terms.

{¶ 19} A "new motor vehicle" is defined as "a motor vehicle the equitable or legal title to which has never been transferred to an ultimate purchaser." 42 U.S.C. 7550(3). A "new motor vehicle engine" is defined similarly as "an engine in a new motor vehicle or a motor vehicle engine the equitable or legal title to which has never been transferred to the ultimate purchaser." *Id.*

{¶ 20} Congress has also helpfully defined the term "ultimate purchaser," as it is used in 42 U.S.C. 7550(3), as "the first person who in good faith purchases such new motor vehicle or new engine for purposes other than resale." 42 U.S.C. 7550(5).

{¶ 21} Taken together, the plain text of the applicable statutes indicates that after a new motor vehicle or new motor-vehicle engine is first sold, the express-preemption clause in 42 U.S.C. 7543(a) no longer applies. *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Prods. Liab. Litigation* ("*In re Volkswagen*"), 959 F.3d 1201, 1216 (9th Cir.2020). Put differently, the Clean Air Act expressly preempts only state and local laws regulating or setting vehicle-emissions standards for *new* motor vehicles and *new* motor-vehicle engines. *See* 42 U.S.C. 7543(a).

{¶ 22} In this case, the relevant Ohio statute, R.C. 3704.16(C)(3), provides that "[n]o person shall knowingly * * * [t]amper with any emission control system installed on or in a motor vehicle after sale, lease, or rental and delivery of the vehicle to the ultimate purchaser, lessee, or renter."

{¶ 23} Notably, R.C. 3704.16(C)(3) does not create or adopt any emissions-control standards and does not apply to new motor vehicles or new motor-vehicle engines. Instead, it applies only to conduct (tampering) that takes place *after* a vehicle has reached its "ultimate purchaser, lessee, or renter." Consequently, R.C. 3704.16(C)(3) does not fall within the scope of the federal Clean Air Act's express-preemption provision.

{¶ 24} In an attempt to get around the plain text of these laws and to avoid the obvious conclusion that the federal Clean Air Act does not expressly preempt R.C. 3704.16(C)(3) and preclude anti-tampering claims under Ohio's Air Pollution Control Act, Volkswagen calls our attention to the decisions in *Allway Taxi, Inc. v. New York*, 340 F.Supp. 1120 (S.D.N.Y.1972), and *Engine Mfrs. Assn. v. S. Coast Air Quality Mgt. Dist.*, 541 U.S. 246, 124 S.Ct. 1756, 158 L.Ed.2d 529 (2004). Neither *Allway Taxi* nor *Engine Mfrs. Assn.*, however, supports Volkswagen's arguments or requires a different conclusion regarding the applicability of the express-preemption provision in Section 209 of the Clean Air Act, 42 U.S.C. 7543(a).

{¶ 25} To begin, the federal district court in *Allway Taxi* upheld a local ordinance that required taxi cabs operating in New York City to be equipped with emissions-control devices. 340 F.Supp. at 1122, 1124. In doing so, that court specifically stated that the definition of "new motor vehicles" provided in the Clean Air Act reveals a clear congressional intent to "preclude states and localities from setting their own exhaust emission control standards only with respect to the manufacture and distribution of *new automobiles*." (Emphasis added.) *Id.* at 1124. In other words, the Clean Air Act prohibits states and local governments from "setting standards governing emission control devices *before the initial sale* or registration of an automobile." (Emphasis added.) *Id.* So, although the *Allway Taxi* court cautioned that its decision should not be read to sanction the imposition of "emission control standards the moment after a new car is bought and

8

registered," *id.*, it nonetheless read the Clean Air Act's express-preemption provision as drawing a distinction between pre- and post-sale emissions regulations.

{¶ 26} Next, nothing in the United States Supreme Court's decision in *Engine Mfrs. Assn.* calls into question this pre- and post-sale distinction. In fact, in determining whether the Clean Air Act preempted rules regulating the types of commercial vehicles that could be purchased or leased within a particular region in California based on different emissions criteria, the court was careful to note that its decision did not answer whether 42 U.S.C. 7543(a) also preempts rules that apply "beyond the purchase of *new vehicles*." (Emphasis added.) *Engine Mfrs. Assn.* at 259. Thus, *Engine Mfrs. Assn.* does not help this court to decide this particular case, which involves state-law claims under a statute governing post-sale conduct and used vehicles.

{¶ 27} Accordingly, we hold that Section 209 of the federal Clean Air Act, 42 U.S.C. 7543(a), does not expressly preempt R.C. 3704.16(C)(3) and preclude the attorney general's anti-tampering claims.

*2. The Federal Clean Air Act Does Not Impliedly Preempt Ohio's Vehicle-Emissions Anti-Tampering Law and Preclude the Attorney General's Claims*

{¶ 28} In addition to its arguments regarding express preemption, Volkswagen also argues that claims brought under R.C. 3704.16(C)(3) are impliedly preempted by the Clean Air Act. According to Volkswagen, 42 U.S.C. 7543(a) impliedly preempts Ohio law because R.C. 3704.16(C)(3) conflicts with and stands as an obstacle to the federal government's ability to ensure continued compliance with its vehicle-emissions standards after a new motor vehicle or new motor-vehicle engine is sold and interferes with the federal EPA's ability to bring and resolve enforcement actions. As with our conclusion regarding its express-preemption arguments, we find these arguments unpersuasive.

{¶ 29} Again, arguments calling for a finding of implied preemption, "like all preemption arguments, must be grounded 'in the text and structure of the statute at issue.' " *Garcia*, ___ U.S. at ___, 140 S.Ct. at 804, 206 L.Ed.2d 146, quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). It is therefore not enough to claim that a state law is impliedly preempted by simply ascribing "unenacted purposes and objectives to a federal statute." *Virginia Uranium, Inc. v. Warren*, ___ U.S. ___, 139 S.Ct. 1894, 1907, 204 L.Ed.2d 377 (2020). Instead, an *actual conflict* between the state and federal law is required. *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 884, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), citing *English*, 496 U.S. at 78-79, 110 S.Ct. 2270, 110 L.Ed.2d 65. For Volkswagen, the lack of an actual conflict is the problem with its argument here.

{¶ 30} First, although it is true that the Clean Air Act contains provisions that apply post-sale and provide the federal government with tools to ensure continued compliance after a new motor vehicle or new motor-vehicle engine is sold, Ohio's anti-tampering law does not stand as an obstacle to the federal scheme or make it impossible to comply with that scheme.

{¶ 31} Indeed, Ohio's law specifically makes it possible to comply with it and the federal scheme by stating that it is not a violation of R.C. 3704.16(C)(3) if the conduct in question is "taken for the purpose of repair or replacement of the emission control system or is a necessary and temporary procedure to repair or replace any other item on the motor vehicle and the action results in the system's compliance with the 'Clean Air Act Amendments.' " R.C. 3704.16(E)(1).

{¶ 32} Importantly, that means that Ohio's law does not conflict with the federal vehicle-warranty statute, 42 U.S.C. 7541(a)(1), federal vehicle-recall procedures, 42 U.S.C. 7541(c)(1), or federal useful-life requirements, 42 U.S.C. 7521(a)(1) and (d). It also means that Volkswagen's fears that it will be punished

for actions taken in response to EPA guidelines or for modifications approved by the EPA are unfounded.

{¶ 33} The bottom line here is that as long as Volkswagen complies with, rather than circumvents, federal law it will have nothing to worry about in Ohio regarding actions brought under R.C. 3704.16(C)(3). By definition, under these circumstances, there is no conflict between the relevant federal and state statutes or any obstacle to Congress's objectives.

{¶ 34} We also disagree with Volkswagen that there is a conflict between federal and Ohio law merely because the Clean Air Act also prohibits emissions-control tampering, *see* 42 U.S.C. 7522(a)(3)(A), and punishes that conduct, *see* 42 U.S.C 7524(a). To begin, the fact that there is some overlap between the state and federal provisions does not automatically indicate that the applicable state law is impliedly preempted. *Garcia*, ___ U.S. at ___, 140 S.Ct. at 806-807, 206 L.Ed.2d 146. Likewise, it is no problem for preemption purposes that emissions-control tampering is punished under both Ohio and federal law. As a matter of fact, it has long been settled that a state government may punish conduct that the federal government also punishes. *California v. Zook*, 336 U.S. 725, 731, 69 S.Ct. 841, 93 L.Ed. 1005 (1949), quoting *United States v. Marigold*, 50 U.S. 560, 569, 13 L.Ed. 257 (1850) (" 'the same act might, as to its character and tendencies, and the consequences it involved, constitute an offence against both the State and Federal governments, and might draw to its commission the penalties denounced by either, as appropriate to its character in reference to each' ").

{¶ 35} Moreover, and perhaps most significantly, the Clean Air Act does not suggest that Congress intended to shield vehicle manufacturers from state-law emissions-control-tampering liability. *In re Volkswagen*, 959 F.3d at 1223. Certainly, if Congress had wished to preclude states from punishing companies or persons for emissions-control tampering, it could have said so. After all, as the Ninth Circuit pointed out in *In re Volkswagen*, a number of states had laws on their

books prohibiting tampering with emissions-control systems in motor vehicles during the period in which Congress amended the Clean Air Act, *id.* at 1219-1220, and Congress did not make "any changes to the preservation of state authority," *id.* at 1220. Because we can presume that Congress was aware of those state laws when it amended the Clean Air Act, *see Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-185, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988), its silence on the issue is " 'powerful evidence that Congress did not intend' to preempt local anti-tampering laws," *In re Volkswagen* at 1220, quoting *Wyeth v. Levine*, 555 U.S. 555, 575, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009).

{¶ 36} Finally, we reject Volkswagen's argument that the potential imposition of state-law penalties under R.C. 3704.06 makes it impossible for the federal EPA to administer its vehicle-emissions program or interferes with the federal EPA's ability to resolve enforcement actions.

{¶ 37} First of all, it is not impossible for a violator to pay federal penalties and state-law penalties relating to the same conduct, so exposure to liability at the state level does not necessarily frustrate the purpose of the federal scheme. *See Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 257, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). The fact that such penalties might be considerable when aggregated, as Volkswagen contends, does not change that conclusion. *California v. ARC Am. Corp.*, 490 U.S. 93, 105, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989) ("Ordinarily, state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law").

{¶ 38} Additionally, there is no evidence that the potential for liability under Ohio's anti-tampering law actually frustrates or interferes with the federal government's interests in any way. In fact, despite the likelihood of subsequent actions by states and local governments here, the federal EPA was tellingly able to resolve its case against Volkswagen. The mere *possibility* that future enforcement actions might be slightly more difficult because of a defendant's potential exposure

to dual liability does not provide a basis for this court to hold that Ohio's anti-tampering law is preempted and that the attorney general's claims here are precluded. *Garcia*, ___ U.S. at ___, 140 S.Ct. at 807, 206 L.Ed.2d 146, quoting United States Constitution, Article VI, cl. 2 ("The Supremacy Clause gives priority to 'the Laws of the United States,' " not the "enforcement priorities or preferences of federal officers").

{¶ 39} Since "as in any field of statutory interpretation, it is our duty to respect not only what Congress wrote but, as importantly, what it didn't write," *Virginia Uranium*, ___ U.S. at ___, 139 S.Ct. at 1900, 204 L.Ed.2d 377, we cannot ignore these realities and manufacture a conflict that has no basis in the text and structure of the applicable state and federal statutes just because it would be advantageous for a particular party. We therefore conclude that Ohio's anti-tampering law, R.C. 3704.16(C)(3), and the attorney general's claims under that provision are not impliedly preempted by the federal Clean Air Act.

### III. CONCLUSION

{¶ 40} For the reasons stated above, we hold that the federal Clean Air Act neither expressly nor impliedly preempts R.C. 3704.16(C)(3) or precludes an anti-tampering claim under Ohio's Air Pollution Control Act for a manufacturer's post-sale tampering with a vehicle's emissions-control system. Accordingly, we affirm the judgment of the Tenth District Court of Appeals.

Judgment affirmed.

DEWINE, STEWART, and DELANEY, JJ., concur.

O'CONNOR, C.J., and KENNEDY, J., concur in judgment only.

DONNELLY, J., dissents, with an opinion.

PATRICIA A. DELANEY, J., of the Fifth District Court of Appeals, sitting for BRUNNER, J.

_____

**DONNELLY, J., dissenting.**

**{¶ 41}** I respectfully dissent from the majority's holding that the federal Clean Air Act, 42 U.S.C. 7401 et seq., does not preempt the antitampering claim brought by appellee, the Ohio Attorney General, pursuant to Ohio's Air Pollution Control Act, R.C. 3704.01 et seq. I would hold that appellant Volkswagen Aktiengesellschaft, d.b.a. Volkswagen Group and/or Volkswagen AG ("Volkswagen"), has met its burden of showing that the state-law claim is impliedly preempted by federal law.

**{¶ 42}** Generally, there are two ways in which federal law may impliedly preempt state law: (1) the federal law is so comprehensive in scope that it occupies the entire field of the regulated activity ("field preemption"), or (2) the federal law and the state law are actually in conflict with each other ("conflict preemption"). *Norfolk S. Ry. Co. v. Bogle*, 115 Ohio St.3d 455, 2007-Ohio-5248, 875 N.E.2d 919, ¶ 7. Because the parties here have framed their arguments around conflict preemption rather than field preemption as a distinct matter, I will focus on the conflict-preemption aspect of the preemption doctrine. .

**{¶ 43}** Within the category of conflict preemption there are two subcategories: (1) "impossibility preemption," which applies when it is impossible to comply with both the state law and the federal law, and (2) "obstacle preemption," which applies when the "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *English v. Gen. Elec. Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990), quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). Regarding impossibility preemption, given that the attorney general is seeking to penalize Volkswagen for its fraud against the United States Environmental Protection Agency ("EPA") relating to motor vehicles that were certified by the EPA, motor-vehicle-emissions standards that were set by the EPA, and actions monitored by the EPA, and for violations that have already been penalized by the EPA, it is readily apparent that it was possible for Volkswagen to

have complied with both the Ohio and federal laws that prohibit tampering with motor-vehicle-emissions systems. Thus, obstacle preemption is the only type of conflict preemption that might apply in this case.

{¶ 44} For Volkswagen's violations of Title II of the federal Clean Air Act, which spanned about a decade and affected motor vehicles throughout the United States, the EPA carefully crafted a multibillion-dollar penalty that balanced a variety of financial and environmental factors pursuant to 42 U.S.C. 7524. In my view, the attorney general's decision to seek an additional judgment that could total more than $1 trillion involves nothing more than the attorney general's disagreement with the penalty that the federal government carefully crafted. In this immediate sense, I believe that there is a clear conflict between the federal and state objectives. And when considering the possibility of similar lawsuits from other states and municipalities across the United States, a broader conflict is apparent; such an action threatens to undermine the enforcement power of the EPA and thereby the efficacy of the entire federal scheme. Because the attorney general's antitampering claims stand as an obstacle to the execution of the full purposes of Congress in the Clean Air Act, they are preempted by federal law.

{¶ 45} The EPA plays a central role in the Clean Air Act, and its enforcement and penalty powers are crucial to the effectiveness of the federal law. In Title II of the Clean Air Act, Congress directs the EPA to "prescribe * * * standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines." 42 U.S.C. 7521(a)(l). In order for it to be able to follow that mandate, the EPA is empowered to set emissions standards for motor vehicles, 42 U.S.C. 7521(a)(l) and (3), establish emissions-control technology requirements, *e.g.*, 42 U.S.C. 7521(a)(6), and regulate the use of emissions-control devices, 42 U.S.C. 7521(a)(4)(A). These exclusively federal standards apply throughout a vehicle's "useful life," 42 U.S.C.

7521(a)(1), and the EPA is authorized to monitor vehicles and their manufacturers throughout that time, 42 U.S.C. 7541 and 7542.

{¶ 46} In order for it to enforce the standards and regulations, the EPA is empowered by the Clean Air Act to conduct testing to ensure that new motor vehicles comply with the federal law as a prerequisite to certification and to refuse to certify vehicles that do not meet the requirements. 42 U.S.C. 7521(m); 42 U.S.C. 7525. Even when a vehicle is no longer considered new under the Clean Air Act, the EPA requires the manufacturer to report any emissions-related defect that affects 25 or more of the vehicles of the same model year, 40 C.F.R. 85.1903, including defects in "software * * * which must function properly to ensure continued compliance with emission standards," 40 C.F.R. 85.1902(b)(2). The EPA requires manufacturers to test a portion of the in-use vehicles that they manufactured, 40 C.F.R. 86.1845-04 and 86.1827-01, and if the vehicles fail those tests then the EPA may require the vehicles to be recalled, 42 U.S.C. 7541(c)(1). The EPA also has the power to bring civil enforcement actions against manufacturers for their violations of the federal law, 42 U.S.C. 7523 through 7525, including violations of the federal statute prohibiting tampering with a motor vehicle's emissions system either before *or after* the sale of the vehicle, 42 U.S.C. 7522(a)(3)(A).

{¶ 47} The EPA's central enforcement mechanism is its power to impose civil penalties pursuant to 42 U.S.C. 7524. The EPA may begin the penalty process either by filing suit in a federal court or by imposing an administrative penalty that may later be subject to judicial review. 42 U.S.C. 7524(b) and (c). Through either method, the goal is to determine an appropriate penalty amount by balancing various factors such as "the gravity of the violation, the economic benefit or savings (if any) resulting from the violation, the size of the violator's business, the violator's history of compliance * * *, action taken to remedy the violation, the effect of the penalty on the violator's ability to continue in business, and such other matters as

justice may require." 42 U.S.C. 7524(b) and (c)(2). It is in that method of enforcing the Clean Air Act and, particularly in its requirements for determining an appropriate penalty, that the conflict between the federal and Ohio laws is most apparent.

{¶ 48} In crafting an appropriate penalty for a violation of Title II of the Clean Air Act, the EPA's goal is to adequately deter future violations. But it must also balance the need for deterrence with factors such as the potential for the penalty to cause the manufacturer to go out of business, the need to not create precedent that adversely affects the EPA's ability to enforce the law, and any relevant "competing public interest considerations." United States Environmental Protection Agency, Clean Air Act Title II Vehicle & Engine Civil Penalty Policy, at 18-19, available at https://www.epa.gov/sites/production/files/2021-01/documents/caatitleiivehicleenginepenaltypolicy011821.pdf (accessed June 9, 2021) [https://perma.cc/95DE-8JMB]. Imposing a penalty so steep that it causes a manufacturer to go out of business might have the immediate negative effect of rendering the manufacturer unable to pay any of its penalties and a wider negative effect of wiping out a large swath of jobs from the United States automotive industry and making vehicles less affordable for United States citizens. Such effects would certainly go against the public's best interests.

{¶ 49} Moreover, if states and municipalities are permitted to sue motor-vehicle manufacturers based on admissions made when settling civil actions with the EPA, manufacturers will be deterred from making such admissions. The efficacy of the EPA's rulemaking and enforcement powers would be severely reduced if manufacturers were to be disincentivized from cooperating with the EPA and other federal governmental entities.

{¶ 50} Following Volkswagen's cooperation with the federal government, it entered into a plea agreement and consent decrees with the EPA in 2017, which required Volkswagen "to pay $4.3 billion in civil and criminal penalties, to invest

$2.0 billion in Zero Emission Vehicle technology, to recall and/or repair the affected vehicles, and to contribute $2.925 billion to an emissions mitigation trust." *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Prods. Liab. Litigation*, 264 F.Supp.3d 1040, 1044 (N.D.Cal.2017). Of the $2.925 billion that Volkswagen paid into the emissions-mitigation trust, over $75 million was allocated to the state of Ohio. The fact that the EPA was empowered by Congress through the Clean Air Act to reach such a large-scale settlement with Volkswagen regarding its nationwide misconduct—and the fact that the federal law obligates the EPA to craft a penalty that thoughtfully balances a multitude of competing interests—indicates to me that the attorney general's seeking a potential additional $1 trillion penalty pursuant to Ohio's Air Pollution Control Act, R.C. 3704.01 et seq., for a local portion of that same misconduct conflicts both with the EPA's immediate authority and the longer-term goals underlying the federal law.

{¶ 51} Courts in Alabama, Minnesota, and Tennessee have concluded that similar antitampering claims filed in their respective states conflicted with the Clean Air Act, because the claims stood as an obstacle to the EPA's effective execution of the purposes and objectives of the Clean Air Act. *See State ex rel. Slatery v. Volkswagen Aktiengesellschaft*, Tenn.App. No. M2018-00791-COA-R9-CV, 2019 WL 1220836, *13 (Mar. 13, 2019); *State of Alabama v. Volkswagen AG*, 279 So.3d 1109, 1128-1129 (Ala.2018) ("*Alabama*"); *State by Swanson v. Volkswagen Aktiengesellschaft*, Minn.App. No. A18-0544, 2018 WL 6273103, *6-9 (Dec. 3, 2018). I recognize that one federal circuit court of appeals has come to the opposite conclusion. *See In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Prods. Liab. Litigation* ("*In re Volkswagen*"), 959 F.3d 1201 (9th Cir.2020). But this court is not required to follow those rulings, including any ruling of a federal circuit court. *See State v. Burnett*, 93 Ohio St.3d 419, 424, 755 N.E.2d 857 (2001). We are free to determine which ruling is better-reasoned and

more persuasive, and I find the decisions from the courts in Alabama, Minnesota, and Tennessee more compelling.

{¶ 52} I disagree with the view of the United States Court of Appeals for the Ninth Circuit, adopted by the majority here, that any conflict between the federal and state laws is rendered irrelevant by the fact that it is perfectly permissible in other circumstances for the same conduct to be punished by both the state and federal governments. *In re Volkswagen* at 1224-1225; *see also* majority opinion at ¶ 34-35, citing *California v. Zook*, 336 U.S. 725, 731, 69 S.Ct. 841, 93 L.Ed. 1005 (1949), and *United States v. Marigold*, 50 U.S. 560, 569, 13 L.Ed. 257 (1850). In *Zook* and *Marigold*, the United States Supreme Court rejected the notion that federal preemption of state law is implicated simply when the federal and state laws prohibit the same conduct and create the possibility of "double punishment." *Zook* at 737 (regarding state and federal prosecutions for selling transportation of persons without an Interstate Commerce Commission permit); *Marigold* at 568-569 (regarding state and federal prosecutions for counterfeiting). But the concern here does not implicate the mere possibility of double punishment; the concern is that punishment by the state will undermine the ability of the federal government to effectively enforce its environmental laws. In *Marigold*, the state criminal prosecution did not undermine any attempt by the federal government to negotiate with counterfeiters across the nation to reach a resolution that adequately penalized the counterfeiters but that still took into account the public's interest in not crippling the entire counterfeiting industry; the prosecution simply sought to punish discrete conduct that was also punishable by federal law. The context of *Marigold* and *Zook* render the court's holdings in those cases inapplicable to the case at hand.

{¶ 53} The decisions by the courts in Alabama, Minnesota, and Tennessee more persuasively reason that state emissions-tampering lawsuits (like that at issue here) conflict with the federal Clean Air Act, because the penalties sought in such lawsuits would upset the balance that the EPA is both empowered and obligated to

achieve when penalizing manufacturers under the federal law and undermine the EPA's ability to achieve such a balance in the future. *See Slatery* at *13; *Alabama* at 1128-1129; *Swanson* at *8. Rather than having only the effect of exacting a double punishment against Volkswagen, the potential state sanctions here are "at odds with achievement of the federal decision about the right degree of pressure to employ," and the inconsistency of the potential sanctions "undermines the congressional calibration of force," *Crosby v. Natl. Foreign Trade Council*, 530 U.S. 363, 380, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000); *see also Alabama* at 1126; *Swanson* at *8.

{¶ 54} The regulation of motor-vehicle emissions reflected in Title II of the Clean Air Act has been "a principally federal project," and the exclusive federal regulation of motor-vehicle emissions is necessary in part because "the possibility of 50 different state regulatory regimes 'raise[s] the spectre of an anarchic patchwork of federal and state regulatory programs, a prospect which threaten[s] to create nightmares for the manufacturers.' " *Engine Mfrs. Assn. v. United States Environmental Protection Agency*, 88 F.3d 1075, 1079 (D.C.Cir.1996), quoting *Motor & Equip. Mfrs. Assn., Inc. v. Environmental Protection Agency*, 627 F.2d 1095, 1109 (D.C.Cir.1979). Allowing states like Ohio to individually regulate and penalize manufacturers for violations relating to motor-vehicle emissions undermines the EPA's comprehensive and carefully balanced enforcement power and creates the anarchic patchwork of federal and state regulatory programs that the Clean Air Act is specifically designed to prevent. Accordingly, because the antitampering claims brought by the attorney general pursuant to R.C. 3704.01 et seq. undermine the purpose and efficacy of the federal Clean Air Act, they are preempted by federal law.

{¶ 55} Because I would hold that the attorney general's state-law claims are impliedly preempted by federal law and would reverse the judgment of the Tenth District Court of Appeals, I dissent.

_____

David Yost, Attorney General, Benjamin M. Flowers, Solicitor General, Michael J. Hendershot, Chief Deputy Solicitor General, and Aaron S. Farmer and Karia A. Ruffin, Assistant Attorneys General, for appellee.

Reminger Co., L.P.A., Hugh J. Bode, and Jackie M. Jewell; and Sullivan & Cromwell, L.L.P., Robert J. Giuffra Jr., David M.J. Rein, Matthew A. Schwartz, and Judson O. Littleton, for appellants Volkswagen Aktiengesellschaft, d.b.a. Volkswagen Group and/or Volkswagen AG; Audi AG; Volkswagen Group of America, Inc., d.b.a. Volkswagen of America, Inc., or Audi of America, Inc.; Volkswagen of America, Inc.; and Audi of America, L.L.C.

Porter, Wright, Morris & Arthur, L.L.P., L. Bradford Hughes, and Elizabeth L. Moyo; and King & Spalding, L.L.P., and Joseph Eisert, for appellants Dr. Ing. h.c. F. Porsche AG, d.b.a. Porsche AG; and Porsche Cars North America, Inc.

Arnold & Porter Kaye Scholer, L.L.P., Jayce Born, Jonathan S. Martel, and S. Zachary Fayne; and Kevin D. Shimp, urging reversal for amici curiae, United States Chamber of Commerce, Ohio Chamber of Commerce, and Alliance for Automotive Innovation.

_____